## JACKSON *v.* METROPOLITAN EDISON CO.

No. 73–5845. Argued October 15, 1974—Decided December 23, 1974

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. DOUGLAS, J., *post,* p. 359, BRENNAN, J., *post,* p. 364, and MARSHALL, J., *post,* p. 365, filed dissenting opinions.

*Jack Greenberg* argued the cause for petitioner. On the briefs were *Alan Linder* and *Jonathan M. Stein.*

*Thomas M. Debevoise* argued the cause and filed a brief for respondent.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Metropolitan Edison Co. is a privately owned and operated Pennsylvania corporation which holds a certificate of public convenience issued by the Pennsylvania Public Utility Commission empowering it to deliver electricity to a service area which includes the city of York, Pa. As a condition of holding its certificate, it is subject to extensive regulation by the Commission. Under a provision of its general tariff filed with the Commission, it has the right to discontinue service to any customer on reasonable notice of nonpayment of bills.[1]

---

*Briefs of *amici curiae* urging reversal were filed by *Franklin A. Martens* for the National Consumer Law Center, Inc., et al., and by *Richard A. Weisz, Stefan M. Rosenzweig, Michael B. Weisz,* and *Anthony G. Amsterdam* for the Legal Aid Foundation of Long Beach et al.

*Gilbert Stein* filed a brief for the city of Philadelphia as *amicus curiae* urging affirmance.

*Peter H. Schiff* and *Richard A. Solomon* filed a brief for the Public Service Commission of New York as *amicus curiae.*

[1] Metropolitan Edison Company Electrical Tariff, Electric Pa. P. U. C. No. 41, Rule 15. This portion of Metropolitan's general tariff, filed with the Utility Commission under the notice-filing requirement of Pa. Stat. Ann., Tit. 66, § 1142 (1959) (since the general tariff involved a rate increase), provides in pertinent part:

"(15)—*Cause for discontinuance of service.*

"Company reserves the right to discontinue its service on reasonable notice and to remove its equipment in case of nonpayment of bill . . . ."

Its filed tariff also gives it the right to terminate service for fraud or for tampering with a meter but Metropolitan did not seek to assert these grounds below.

Petitioner Catherine Jackson is a resident of York, who has received electricity in the past from respondent. Until September 1970, petitioner received electric service to her home in York under an account with respondent in her own name. When her account was terminated because of asserted delinquency in payments due for service, a new account with respondent was opened in the name of one James Dodson, another occupant of the residence, and service to the residence was resumed. There is a dispute as to whether payments due under the Dodson account for services provided during this period were ever made. In August 1971, Dodson left the residence. Service continued thereafter but concededly no payments were made. Petitioner states that no bills were received during this period.

On October 6, 1971, employees of Metropolitan came to the residence and inquired as to Dodson's present address. Petitioner stated that it was unknown to her. On the following day, another employee visited the residence and informed petitioner that the meter had been tampered with so as not to register amounts used. She disclaimed knowledge of this and requested that the service account for her home be shifted from Dodson's name to that of one Robert Jackson, later identified as her 12-year-old son. Four days later on October 11, 1971, without further notice to petitioner, Metropolitan employees disconnected her service.

Petitioner then filed suit against Metropolitan in the United States District Court for the Middle District of Pennsylvania under the Civil Rights Act of 1871, 42 U. S. C. § 1983, seeking damages for the termination and an injunction requiring Metropolitan to continue providing power to her residence until she had been afforded notice, a hearing, and an opportunity to pay any amounts found due. She urged that under state law she had an

entitlement to reasonably continuous electrical service to her home [2] and that Metropolitan's termination of her service for alleged nonpayment, action allowed by a provision of its general tariff filed with the Commission, constituted "state action" depriving her of property in violation of the Fourteenth Amendment's guarantee of due process of law.[3]

---

[2] The basis for this claimed entitlement is Pa. Stat. Ann., Tit. 66, § 1171 (1959), providing in part:

"Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities . . . . Such service also shall be reasonably continuous and without unreasonable interruptions or delay. . . ."

Mrs. Jackson finds in this provision a state-law entitlement to continuing utility service to her residence. She reasons that under the Due Process Clause of the Fourteenth Amendment she cannot be deprived of this entitlement to utility service without adequate notice and a hearing before an impartial body: until these are completed, her service must continue. Because of our conclusion on the threshold question of state action, we do not reach questions relating to the existence of a property interest or of what procedural guarantees the Fourteenth Amendment would require if a property interest were found to exist.

MR. JUSTICE BRENNAN, dissenting, *post*, at 364, concludes that there is no justiciable controversy between petitioner and respondent because whatever entitlement to service petitioner had was previously terminated by respondent in accordance with its tariff. We do not believe this to be any less a determination of the merits of the action than is our conclusion that whatever deprivation she may have suffered was not caused by the State. Issues of whether a claimed entitlement is "property" within the meaning of the Due Process Clause, *Board of Regents* v. *Roth,* 408 U. S. 564 (1972), and whether if so its deprivation was consistent with due process, see *Arnett* v. *Kennedy,* 416 U. S. 134 (1974), are themselves constitutional questions which we find no occasion to reach in this case.

[3] Section 1 of the Fourteenth Amendment provides in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without

The District Court granted Metropolitan's motion to dismiss petitioner's complaint on the ground that the termination did not constitute state action and hence was not subject to judicial scrutiny under the Fourteenth Amendment.[4] On appeal, the United States Court of Appeals for the Third Circuit affirmed, also finding an absence of state action.[5] We granted certiorari to review this judgment.[6]

The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." In 1883, this Court in the *Civil Rights Cases,* 109 U. S. 3, affirmed the essential dichotomy set forth in that Amendment between deprivation by the State, subject to scrutiny under its provisions, and private conduct, "however discriminatory or wrongful," against which the Fourteenth Amendment offers no shield. *Shelley* v. *Kraemer,* 334 U. S. 1 (1948).

We have reiterated that distinction on more than one occasion since then. See, *e. g., Evans* v. *Abney,* 396 U. S. 435, 445 (1970); *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 171–179 (1972). While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is "private," on

---

due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[4] The decision is reported at 348 F. Supp. 954 (1972).

[5] The decision is reported at 483 F. 2d 754 (1973).

[6] 415 U. S. 912 (1974). Compare *Kadlec* v. *Illinois Bell Telephone Co.,* 407 F. 2d 624 (CA7), cert. denied, 396 U. S. 846 (1969); *Lucas* v. *Wisconsin Electric Power Co.,* 466 F. 2d 638 (CA7 1972), cert. denied, 409 U. S. 1114 (1973), with *Palmer* v. *Columbia Gas of Ohio, Inc.,* 479 F. 2d 153 (CA6 1973), modified in *Turner* v. *Impala Motors,* 503 F. 2d 607 (CA6 1974). Cf. *Ihrke* v. *Northern States Power Co.,* 459 F. 2d 566 (CA8), vacated as moot, 409 U. S. 815 (1972).

the one hand, or "state action," on the other, frequently admits of no easy answer. *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 723 (1961); *Moose Lodge No. 107* v. *Irvis, supra,* at 172.

Here the action complained of was taken by a utility company which is privately owned and operated, but which in many particulars of its business is subject to extensive state regulation. The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.[7] 407 U. S., at 176–177. Nor does the fact that the regulation is extensive and detailed, as in the case of most public utilities, do so. *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 462 (1952). It may well be that

---

[7] Enterprises subject to the same regulatory system as Metropolitan are enumerated in the definition of "public utility" contained in Pa. Stat. Ann., Tit. 66, § 1102 (17) (1959 and Supp. 1974–1975). Included in this definition are all companies engaged in providing gas, power, or water; all common carriers, pipeline companies, telephone and telegraph companies, sewage collection and disposal companies; and corporations affiliated with any company engaging in such activities. Among some of the enterprises held subject to this regulatory scheme are freight forwarding and storage companies (*Highway Freight Co.* v. *Public Service Comm'n,* 108 Pa. Super. 178, 164 A. 835 (1933)), real estate developers who, incident to their business, provide water services (*Sayre Land Co.* v. *Pennsylvania Public Utility Comm'n,* 21 D. & C. 2d 469 (1959)), and individually owned taxicabs. *Pennsylvania Public Utility Comm'n* v. *Israel,* 356 Pa. 400, 52 A. 2d 317 (1947). In *Philadelphia Rural Transit Co.* v. *Philadelphia,* 309 Pa. 84, 93, 159 A. 861, 864 (1932), the court estimated that there were 26 distinct types of enterprises subject to this regulatory system, and a fair reading of Pennsylvania law indicates a substantial expansion of included enterprises since that case. The incidents of regulation do not appear materially different between enterprises. If the mere existence of this regulatory scheme made Metropolitan's action that of the State, then presumably the actions of a lone Philadelphia cab driver could also be fairly treated as those of the State of Pennsylvania.

acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be "state" acts than will the acts of an entity lacking these characteristics. [But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.] *Moose Lodge No. 107, supra,* at 176. The true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test is met. *Burton* v. *Wilmington Parking Authority, supra.*

Petitioner advances a series of contentions which, in her view, lead to the conclusion that this case should fall on the *Burton* side of the line drawn in the *Civil Rights Cases, supra,* rather than on the *Moose Lodge* side of that line. We find none of them persuasive.

Petitioner first argues that "state action" is present because of the monopoly status allegedly conferred upon Metropolitan by the State of Pennsylvania. As a factual matter, it may well be doubted that the State ever granted or guaranteed Metropolitan a monopoly.[8] But assuming that it had, this fact is not determinative in consider-

---

[8] It is provided in Pa. Stat. Ann., Tit. 66, § 1121 (Supp. 1974–1975), that issuance of a certificate of public convenience is a prerequisite for engaging in the utility business in Pennsylvania. The requirements for obtaining such a certificate are described in Pa. Stat. Ann., Tit. 66, §§ 1122, 1123 (1959 and Supp. 1974–1975). There is nothing in either Metropolitan's certificate or in the statutes under which it was issued indicating that the State has granted or guaranteed to Metropolitan monopoly status. In fact Metropolitan does face competition within portions of its service area from another private utility company and from municipal utility companies. Metropolitan was organized in 1874, 39 years before Pennsylvania's adoption of its first utility regulatory scheme in 1913. There is no indication that it faced any greater competition in 1912 than today. As petitioner admits, such public utility companies are natural mo-

ing whether Metropolitan's termination of service to petitioner was "state action" for purposes of the Fourteenth Amendment. In *Pollak, supra,* where the Court dealt with the activities of the District of Columbia Transit Co., a congressionally established monopoly, we expressly disclaimed reliance on the monopoly status of the transit authority. 343 U. S., at 462. Similarly, although certain monopoly aspects were presented in *Moose Lodge No. 107, supra,* we found that the Lodge's action was not subject to the provisions of the Fourteenth Amendment. In each of those cases, there was insufficient relationship between the challenged actions of the entities involved and their monopoly status. There is no indication of any greater connection here.

Petitioner next urges that state action is present because respondent provides an essential public service required to be supplied on a reasonably continuous basis by Pa. Stat. Ann., Tit. 66, § 1171 (1959), and hence performs a "public function." We have, of course, found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State. See, *e. g., Nixon* v. *Condon,* 286 U. S. 73 (1932) (election); *Terry* v. *Adams,* 345 U. S. 461 (1953) (election); *Marsh* v. *Alabama,* 326 U. S. 501 (1946) (company town); *Evans* v. *Newton,* 382 U. S. 296 (1966) (municipal park). If

nopolies created by the economic forces of high threshold capital requirements and virtually unlimited economy of scale. Burdick, The Origin of the Peculiar Duties of Public Service Companies, 11 Col. L. Rev. 514 (1911); H. Trachsel, Public Utility Regulation 7–8, 52 (1947). Regulation was superimposed on such natural monopolies as a substitute for competition and not to eliminate it:

'The primary object of the Public Utility Law is not to establish monopolies or to guarantee the security of investments in public service corporations, but to serve the interests of the public." *Highway Express Lines, Inc.* v. *Pennsylvania Public Utility Comm'n,* 195 Pa. Super. 92, 100, 169 A. 2d 798, 802 (1961); cf. *Pottsville Union Traction Co.* v. *Public Service Comm'n,* 67 Pa. Super. 301, 304 (1917).

we were dealing with the exercise by Metropolitan of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one. But while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities, it imposes no such obligation on the State. The Pennsylvania courts have rejected the contention that the furnishing of utility services is either a state function or a municipal duty. *Girard Life Insurance Co.* v. *City of Philadelphia,* 88 Pa. 393 (1879); *Baily* v. *Philadelphia,* 184 Pa. 594, 39 A. 494 (1898).

Perhaps in recognition of the fact that the supplying of utility service is not traditionally the exclusive prerogative of the State, petitioner invites the expansion of the doctrine of this limited line of cases into a broad principle that all businesses "affected with the public interest" are state actors in all their actions.

We decline the invitation for reasons stated long ago in *Nebbia* v. *New York,* 291 U. S. 502 (1934), in the course of rejecting a substantive due process attack on state legislation:

> "It is clear that there is no closed class or category of businesses affected with a public interest . . . . The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest,' and 'clothed with a public use,' have been brought forward as the criteria . . . it has been admitted that they are not susceptible of definition and form an unsatisfactory test . . . ." *Id.,* at 536.

See, *e. g., Tyson & Brother* v. *Banton,* 273 U. S. 418, 451 (1927) (Stone, J., dissenting).

Doctors, optometrists, lawyers, Metropolitan, and Nebbia's upstate New York grocery selling a quart of milk are all in regulated businesses, providing arguably essential goods and services, "affected with a public interest." We do not believe that such a status converts their every action, absent more, into that of the State.[9]

We also reject the notion that Metropolitan's termination is state action because the State "has specifically authorized and approved" the termination practice. In the instant case, Metropolitan filed with the Public Utility Commission a general tariff—a provision of which states Metropolitan's right to terminate service for non-payment.[10] This provision has appeared in Metropolitan's previously filed tariffs for many years and has never been the subject of a hearing or other scrutiny by the Commission.[11] Although the Commission did hold

---

[9] The argument has been impliedly rejected by this Court on a number of occasions. See, e. g., *Civil Rights Cases*, 109 U. S. 3, 8 (1883). It is difficult to imagine a regulated activity more essential or more "clothed with the public interest" than the maintenance of schools, yet we stated in *Evans v. Newton*, 382 U. S. 296, 300 (1966):

"The range of governmental activities is broad and varied, and the fact that government has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the same constitutional inhibitions. While a State may not segregate public schools so as to exclude one or more religious groups, those sects may maintain their own parochial educational systems."

[10] See n. 1, *supra*. The same provision appeared in all of Metropolitan's prior general tariffs. The sole reason for substituting the new general tariff, which contains all the terms and conditions of Metropolitan's service, was to procure a rate increase. This was the sole change between Metropolitan's Electrical Tariff No. 41 and its predecessor.

[11] Petitioner does not contest the fact that Metropolitan had this right at common law before the advent of regulation. Brief for Petitioner 31.

hearings on portions of Metropolitan's general tariff relating to a general rate increase, it never even considered the reinsertion of this provision in the newly filed general tariff.[12] The provision became effective 60 days after filing when not disapproved by the Commission.[13]

As a threshold matter, it is less than clear under state law that Metropolitan was even required to file this provision as part of its tariff or that the Commission would have had the power to disapprove it.[14] The District Court observed that the sole connection of the Commission with this regulation was Metropolitan's simple notice filing with the Commission and the lack of any Commission action to prohibit it.[15]

---

[12] Petitioner concedes that the hearing was solely devoted to the question of the proposed rate increase. *Id.*, at 30.

[13] See Pa. Stat. Ann., Tit. 66, § 1148 (1959); Pa. P. U. C. Tariff Regulations, § II, "Public Notice of Tariff Changes." These provisions specify that utility companies must give 60 days' notice to the public before changing their rules filed in their general tariff. Since Pa. Stat. Ann., Tit. 66, § 1171 (1959), provides that "[s]ubject to . . . the regulations or orders of the commission, every public utility may have reasonable rules and regulations governing the conditions under which it shall be required to render service," the Commission arguably had the power to disapprove utility rules. There is no evidence that it has ever even considered the provision in question. When the 60-day notice period passed, the provisions became effective.

[14] Pennsylvania P. U. C. Tariff Regulations, § VIII, "Discount for Prompt Payment and Penalties for Delayed Payment of Bills," is the only authority cited for a state-imposed requirement that Metropolitan file its termination provision as part of its general tariff. This section requires the filing of "penalties" imposed upon customers for failures to pay bills promptly. Respondent argues that this applies only to monetary penalties. There is no Pennsylvania case law on the question.

[15] "The only apparent state involvement with the activity complained of here is in Tariff Reg. VIII of the Pennsylvania P. U. C. . . . . [T]he purpose of Tariff Reg. VIII is to insure that public utilities inform their patrons of any possible penalty for failing to pay their

 

The case most heavily relied on by petitioner is *Public Utilities Comm'n* v. *Pollak, supra.* There the Court dealt with the contention that Capital Transit's installation of a piped music system on its buses violated the First Amendment rights of the bus riders. It is not entirely clear whether the Court alternatively held that Capital Transit's action was action of the "State" for First Amendment purposes, or whether it merely assumed, *arguendo,* that it was and went on to resolve the First Amendment question adversely to the bus riders.[16] In either event, the nature of the state involvement there was quite different than it is here. The District of Columbia Public Utilities Commission, on its own motion, commenced an investigation of the effects of the piped music, and after a full hearing concluded not only that Capital Transit's practices were "not inconsistent with public convenience, comfort, and safety," 81 P. U. R. (N. S.) 122, 126 (1950), but also that the

---

bills. As in *Kadlec,* defendant here acted pursuant to its own regulations and out of a purely private, economic motive. No state official participated in the practice complained of, nor is it alleged that the state requested or co-operated in the suspension of service." 348 F. Supp., at 958.

[16] See 343 U. S., at 462. At one point the Court states:

"We find in the reasoning of the court below a sufficiently close relation between the Federal Government and the radio service to make it necessary for us to consider those Amendments." *Ibid.*

Later, the opinion states:

"We, therefore, find it appropriate to examine into what restriction, if any, the First and Fifth Amendments place upon the Federal Government . . . *assuming* that the action of Capital Transit . . . amounts to sufficient Federal Government action to make the First and Fifth Amendments applicable thereto." *Id.,* at 462–463. (Emphasis added.)

The Court then went on to find no constitutional violation in the challenged action.

practice "in fact, through the creation of better will among passengers, . . . tends to improve the conditions under which the public ride." *Ibid.* Here, on the other hand, there was no such imprimatur placed on the practice of Metropolitan about which petitioner complains. The nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into "state action." At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State,[17] does not make its action in doing so "state action" for purposes of the Fourteenth Amendment.

We also find absent in the instant case the symbiotic relationship presented in *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961). There where a private lessee, who practiced racial discrimination, leased space for a restaurant from a state parking authority in a publicly owned building, the Court held that the State had so far insinuated itself into a position of interdependence with the restaurant that it was a joint participant in

---

[17] As in *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 173 (1972), there is no suggestion in this record that the Pennsylvania Public Utility Commission intended either overtly or covertly to encourage the practice. See n. 15, *supra.*

the enterprise. *Id.*, at 725. We cautioned, however, that while "a multitude of relationships might appear to some to fall within the Amendment's embrace," differences in circumstances beget differences in law, limiting the actual holding to lessees of public property. *Id.*, at 726.

Metropolitan is a privately owned corporation, and it does not lease its facilities from the State of Pennsylvania. It alone is responsible for the provision of power to its customers. In common with all corporations of the State it pays taxes to the State, and it is subject to a form of extensive regulation by the State in a way that most other business enterprises are not. But this was likewise true of the appellant club in *Moose Lodge No. 107* v. *Irvis, supra,* where we said:

> "However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise." 407 U. S., at 176–177.

All of petitioner's arguments taken together show no more than that Metropolitan was a heavily regulated, privately owned utility, enjoying at least a partial monopoly in the providing of electrical service within its territory, and that it elected to terminate service to petitioner in a manner which the Pennsylvania Public Utility Commission found permissible under state law. Under our decision this is not sufficient to connect the State of Pennsylvania with respondent's action so as to make the latter's conduct attributable to the State for purposes of the Fourteenth Amendment.

We conclude that the State of Pennsylvania is not sufficiently connected with respondent's action in terminating petitioner's service so as to make respondent's

conduct in so doing attributable to the State for purposes of the Fourteenth Amendment. We therefore have no occasion to decide whether petitioner's claim to continued service was "property" for purposes of that Amendment, or whether "due process of law" would require a State taking similar action to accord petitioner the procedural rights for which she contends. The judgment of the Court of Appeals for the Third Circuit is therefore

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting.

I reach the opposite conclusion from that reached by the majority on the state-action issue.

The injury alleged took place when respondent discontinued its service to this householder without notice or opportunity to remedy or contest her alleged default, even though its tariff provided that respondent might "discontinue its service on reasonable notice." [1] May a State allow a utility—which in this case has no competitor—to exploit its monopoly in violation of its own tariff? May a utility have complete immunity under federal law when the State allows its regulatory agency to become the prisoner of the utility or, by a listless attitude of no concern, to permit the utility to use its monopoly power in a lawless way?

In *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961), we said: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the

---

[1] Rule 15 of the tariff provides in part:

"Company reserves the right to discontinue its service on reasonable notice and to remove its equipment in case of nonpayment of bill or violation of the Pennsylvania Public Utility Commission's or Company's Rules and Regulations; or, without notice, for abuse, fraud, or tampering with the connections, meters or other equipment of Company. Failure by Company to exercise this right shall not be deemed a waiver thereof."

State in private conduct be attributed its true significance." *Id.*, at 722. A particularized inquiry into the circumstances of each case is necessary in order to determine whether a given factual situation falls within "the variety of individual-state relationships which the [Fourteenth] Amendment was designed to embrace." *Ibid.* As our subsequent discussion in *Burton* made clear, the dispositive question in any state-action case is not whether any single fact or relationship presents a sufficient degree of state involvement, but rather whether the aggregate of all relevant factors compels a finding of state responsibility.[2] *Id.*, at 722–726. See generally *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163 (1972).

It is not enough to examine seriatim each of the factors upon which a claimant relies and to dismiss each individually as being insufficient to support a finding of state action. It is the aggregate that is controlling.

It is said that the mere fact of respondent's monopoly status, assuming *arguendo* that that status is state conferred or state protected,[3] "is not determinative in con-

---

[2] The court below in *Burton* had relied heavily on a number of facts indicating minimal state involvement, but we regarded that court's analysis as unduly restricted in its scope: "While these factual considerations are indeed validly accountable aspects of the enterprise upon which the State has embarked, we cannot say that they lead inescapably to the conclusion that state action is not present. Their persuasiveness is diminished when evaluated in the context of other factors which must be acknowledged." 365 U. S., at 723.

After discussing those additional factors in greater detail, we concluded: "Addition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn." *Id.*, at 724.

[3] It seems irrelevant that Metropolitan was organized prior to the inauguration of utility regulation in Pennsylvania, and that a utility

sidering whether Metropolitan's termination of service to petitioner was 'state action' for purposes of the Fourteenth Amendment." *Ante,* at 351–352. Even so, a state-protected monopoly status is highly relevant in assessing the aggregate weight of a private entity's ties to the State.[4]

It is said that the fact that respondent's services are "affected with a public interest" is not determinative. I agree that doctors, lawyers, and grocers are not transformed into state actors simply because they provide arguably essential goods and services and are regulated by the State. In the present case, however, respondent is not just one person among many; it is the only public utility furnishing electric power to the city. When power is denied a householder, the home, under modern conditions, is likely to become unlivable.

Respondent's procedures for termination of service may never have been subjected to the same degree of state scrutiny and approval, whether explicit or implicit, that was present in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451 (1952). Yet in the present case the State is heavily involved in respondent's termination procedures, getting into the approved tariff a requirement of "reasonable notice." Pennsylvania has undertaken to regulate numerous aspects of respondent's operations in some de-

of this sort is, for all practical purposes, a natural monopoly. Whatever its origins, the existing situation presents a monopoly enterprise subject to detailed state regulation; the nature and extent of that regulation take on particular significance in light of the lack of any alternative source of service available to Metropolitan's customers.

[4] Our disclaimer of reliance upon this factor in *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 462 (1952), should not be read as holding that monopoly status is wholly irrelevant; the "disclaimer" on its face simply states that monopoly status was not used as an ingredient of the finding of federal governmental involvement in that case.

tail,[5] and a "hands-off" attitude of permissiveness or neutrality toward the operations in this case is at war with the state agency's functions of supervision over respondent's conduct in the area of servicing householders, particularly where (as here) the State would presumably lend its weight and authority to facilitate the enforcement of respondent's published procedures. Cf. *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144 (1970); *Reitman* v. *Mulkey*, 387 U. S. 369 (1967); *Railway Employes' Dept.* v. *Hanson*, 351 U. S. 225 (1956); *Shelley* v. *Kraemer*, 334 U. S. 1 (1948).

In the aggregate, these factors depict a monopolist providing essential public services as a licensee of the State and within a framework of extensive state supervision and control. The particular regulations at issue, promulgated by the monopolist, were authorized by state law and were made enforceable by the weight and authority of the State. Moreover, the State retains the power of oversight to review and amend the regulations if the public interest so requires. Respondent's actions are sufficiently intertwined with those of the State, and its termination-of-service provisions are sufficiently buttressed by state law to warrant a holding that respondent's actions in terminating this householder's service were "state action" for the purpose of giving federal jurisdiction over respondent under 42 U. S. C. § 1983. Though the Court pays lip service to the need for assessing the totality of the State's involvement in this enterprise, *ante,* at 358, its underlying analysis is

---

[5] The Public Utility Commission is given extensive control over utility rates, Pa. Stat. Ann., Tit. 66, § 1141 *et seq.* (1959 and Supp. 1974–1975), and over the character and quality of utility services and facilities, §§ 1171, 1182–1183; it is given broad power to receive and investigate complaints, §§ 1391, 1398, and to regulate and supervise the activities, rules, and contractual undertakings of utilities, §§ 1171, 1341–1343, 1360.

fundamentally sequential rather than cumulative. In that perspective, what the Court does today is to make a significant departure from our previous treatment of state-action issues.

Mr. Justice Brandeis in *Liggett Co.* v. *Lee*, 288 U. S. 517 (1933), in speaking of the competition among the States to ease the opportunities and methods of incorporation, said: "The race was one not of diligence but of laxity." *Id.*, at 559 (dissenting opinion). One has only to peruse the 84-part Utility Corporations Report by the Federal Trade Commission (under the direction of its able counsel the late Robert E. Healy) to realize that state regulation of utilities has largely made state commissions prisoners of the utilities. See especially S. Doc. No. 92, 70th Cong., 1st Sess., pt. 73–A (1936); and see *id.*, pt. 72–A, p. 880. In this connection it should be noted that successful attempts by public utilities to exclude themselves from the antitrust laws have been based on the assertion that their monopoly activity constitutes "state action." See *Washington Gas Light Co.* v. *Virginia Electric & Power Co.*, 438 F. 2d 248, 250–252 (CA4 1971); *Gas Light Co. of Columbus* v. *Georgia Power Co.*, 440 F. 2d 1135, 1138–1140 (CA5 1971).

By like token the tariff prescribing termination-of-service procedures was possible only because of "state action." And it would be compatible only with administrative abdication of authority to equate "administrative silence with abandonment of administrative duty." *Washington Gas Light Co.* v. *Virginia Electric & Power Co., supra,* at 252.

Section 1983 was designed to give citizens a federal forum [6] for civil rights complaints wherever, by direct or

---

[6] There is no requirement for an exhaustion of state remedies before suing under § 1983 (see *Wilwording* v. *Swenson,* 404 U. S. 249 (1971)), though suggestions for statutory changes in that regard

indirect actions, a State, acting "in cahoots" with a private group or through neglect or listless oversight, allows a private group to perpetrate an injury. The theory is that in those cozy situations, local politics and the pressure of economic overlords on subservient state agencies make recovery in state courts unlikely. I realize we are in an area where we witness a great retreat from the exercise of federal jurisdiction which the Congress has conferred on federal courts. The sentiment here is that state courts are as hospitable as federal courts to federal claims. That may well be true, in some instances. But it is for the Senate and the House to make that decision. We should not tolerate an erosion of the policy Congress expressed in drafting § 1983.

Section 1983 addresses itself to grievances inflicted "under color of any statute, ordinance, [or] regulation . . . of any State . . . ." The regulatory regime imposed by Pennsylvania on respondent utility seems to fit this statute like a glove. Electrical service, being a necessity of life under the circumstances of this case, is an entitlement which under our decisions may not be taken without the requirements of procedural due process. *Fuentes* v. *Shevin,* 407 U. S. 67, 80 (1972); *Goldberg* v. *Kelly,* 397 U. S. 254 (1970); *Palmer* v. *Columbia Gas of Ohio, Inc.,* 479 F. 2d 153 (CA6 1973).

Mr. Justice Brennan, dissenting.

I do not think that a controversy existed between petitioner and respondent entitling petitioner to be heard in this action. Under Pennsylvania law respondent's duty under Pa. Stat. Ann., Tit. 66, § 1171 (1959), to provide service was limited by § 25 of the General Rules and Regulations, the Electric Service Tariff, on file with the

have been made. Judd, The Expanding Jurisdiction of the Federal Courts, 60 A. B. A. J. 938, 941 (1974).

Pennsylvania Public Utility Commission, to provision of such service only to "customers," defined as "[a]ny person[s] . . . lawfully receiving service from [the] Company." Petitioner, as the Court notes, ceased being a "customer" in September 1970 when her account was terminated for nonpayment of bills. That termination was pursuant to Rule 15 of the tariff quoted by the Court in n. 1. From September 1970 to September 1971, respondent's "customer" was James Dodson; and his delinquency in payment for service during that period, not petitioner's delinquency before September 1970, was the occasion for the termination of service on October 11, 1971. An effort by petitioner at that time to have service continued if she paid $30 on account on her delinquent 1970 bill failed when respondent rejected the offer and shut off the service. In these circumstances petitioner had no basis in my view for the claimed entitlement under § 1171 quoted by the Court in n. 2, and therefore no controversy existed between petitioner and respondent which could be the subject of her action. I would therefore intimate no view upon the correctness of the holdings below whether the termination of service on October 11, 1971, constituted state action but would vacate the judgment of the Court of Appeals with direction that the case be remanded to the District Court with instruction to enter a new judgment dismissing the complaint. See *Golden* v. *Zwickler*, 394 U. S. 103, 109–110 (1969).

Mr. JUSTICE MARSHALL, dissenting.

I agree with my Brother BRENNAN that this case is a very poor vehicle for resolving the difficult and important questions presented today. The confusing sequence of events leading to the challenged termination makes it unclear whether petitioner has a property right under state law to the service she was receiving from the

respondent company. Because these complexities would seriously hamper resolution of the merits of the case, I would dismiss the writ as improvidently granted. Since the Court has disposed of the case by finding no state action, however, I think it appropriate to register my dissent on that point.

I

The Metropolitan Edison Co. provides an essential public service to the people of York, Pa. It is the only entity, public or private, that is authorized to supply electric service to most of the community. As a part of its charter to the company, the State imposes extensive regulations, and it cooperates with the company in myriad ways. Additionally, the State has granted its approval to the company's mode of service termination—the very conduct that is challenged here. Taking these factors together, I have no difficulty finding state action in this case. As the Court concluded in *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715, 725 (1961), the State has sufficiently "insinuated itself into a position of interdependence with [the company] that it must be recognized as a joint participant in the challenged activity."

Our state-action cases have repeatedly relied on several factors clearly presented by this case: a state-sanctioned monopoly; an extensive pattern of cooperation between the "private" entity and the State; and a service uniquely public in nature. Today the Court takes a major step in repudiating this line of authority and adopts a stance that is bound to lead to mischief when applied to problems beyond the narrow sphere of due process objections to utility terminations.

A

When the State confers a monopoly on a group or organization, this Court has held that the organization assumes many of the obligations of the State. *Railway*

*Employes' Dept.* v. *Hanson,* 351 U. S. 225 (1956). Even when the Court has not found state action based solely on the State's conferral of a monopoly, it has suggested that the monopoly factor weighs heavily in determining whether constitutional obligations can be imposed on formally private entities. See *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192 (1944). Indeed, in *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 177 (1972), the Court was careful to point out that the Pennsylvania liquor-licensing scheme "falls far short of conferring upon club licensees a monopoly in the dispensing of liquor in any given municipality or in the State as a whole."

The majority distinguishes this line of cases with a cryptic assertion that public utility companies are "natural monopolies." *Ante,* at 351–352, n. 8. The theory behind the distinction appears to be that since the State's purpose in regulating a natural monopoly is not to aid the company but to prevent its charging monopoly prices, the State's involvement is somehow less significant for state-action purposes. I cannot agree that so much should turn on so narrow a distinction. Initially, it is far from obvious that an electric company would not be subject to competition if the market were unimpeded by governmental restrictions. Certainly the "start-up" costs of initiating electric service are substantial, but the rewards available in a relatively inelastic market might well be sufficient under the right circumstances to attract competitive investment. Instead, the State has chosen to forbid the high profit margins that might invite private competition or increase pressure for state ownership and operation of electric power facilities.

The difficulty inherent in this kind of economic analysis counsels against excusing natural monopolies from the reach of state-action principles. To invite inquiry into whether a particular state-sanctioned monopoly might have survived without the State's express approval

grounds the analysis in hopeless speculation. Worse, this approach ignores important implications of the State's policy of utilizing private monopolies to provide electric service. Encompassed within this policy is the State's determination not to permit governmental competition with the selected private company, but to cooperate with and regulate the company in a multitude of ways to ensure that the company's service will be the functional equivalent of service provided by the State.[1]

### B

The pattern of cooperation between Metropolitan Edison and the State has led to significant state involvement in virtually every phase of the company's business. The majority, however, accepts the relevance of the State's regulatory scheme only to the extent that it demonstrates state support for the challenged termination procedure. Moreover, after concluding that the State in this case had not approved the company's termination procedures, the majority suggests that even state authorization and approval would not be sufficient: the State would apparently have to *order* the termination practice in question to satisfy the majority's state-action test, see *ante,* at 357.

---

[1] The State's regulatory pattern makes it amply clear that it expects utility companies to behave more like governmental entities than private corporations. The rates are fixed by the Public Utility Commission, as are the standards of service and the company's system of accounting. Pa. Stat. Ann., Tit. 66, §§ 1141, 1149, 1171, 1182, 1183, 1211 (1959). The character of the facilities is subject to state approval and continuing supervision, and the State also requires that the service "shall be reasonably continuous and without unreasonable interruptions or delay." § 1171. The certificate of public convenience confers certain eminent domain rights upon the company, § 1124 (Supp. 1974–1975), as well as the right of entry onto a customer's property to maintain and inspect its equipment. Pa. P. U. C. Electric Regulations, Rule 14D.

I disagree with the majority's position on three separate grounds. First, the suggestion that the State would have to "put its own weight on the side of the proposed practice by ordering it" seems to me to mark a sharp departure from our previous state-action cases. From the *Civil Rights Cases,* 109 U. S. 3 (1883), to *Moose Lodge, supra,* we have consistently indicated that state authorization and approval of "private" conduct would support a finding of state action.[2]

Second, I question the wisdom of giving such short shrift to the extensive interaction between the company and the State, and focusing solely on the extent of state support for the particular activity under challenge. In cases where the State's only significant involvement is through financial support or limited regulation of the private entity, it may be well to inquire whether the

---

[2] In the *Civil Rights Cases,* the Court suggested that state action might be found if the conduct in question were "sanctioned in some way by the State," 109 U. S., at 17. Later cases made it clear that the State's sanction did not need to be in the form of an affirmative command. *McCabe* v. *Atchison, T. & S. F. R. Co.,* 235 U. S. 151 (1914); *Nixon* v. *Condon,* 286 U. S. 73 (1932); *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451 (1952). In *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 725 (1961), the Court noted that by its inaction, the State had "elected to place its power, property and prestige behind the admitted discrimination," although the State did not actually order the discrimination. See *id.,* at 726–727 (STEWART, J., concurring). And in *Reitman* v. *Mulkey,* 387 U. S. 369, 381 (1967), the Court based its "state action" ruling on the fact that the California constitutional provision "was intended to authorize, and does authorize, racial discrimination in the housing market." Even in *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 176–177 (1972), the Court suggested that if the State's regulation had in any way fostered or encouraged racial discrimination, a state-action finding might have been justified. Certainly this is a less rigid standard than the Court's requirement in this case that the Public Utility Commission be shown to have ordered the challenged conduct, not merely to have approved it.

State's involvement suggests state approval of the objectionable conduct. See *Powe* v. *Miles*, 407 F. 2d 73, 81 (CA2 1968); *Grossner* v. *Trustees of Columbia University*, 287 F. Supp. 535, 547–548 (SDNY 1968). But where the State has so thoroughly insinuated itself into the operations of the enterprise, it should not be fatal if the State has not affirmatively sanctioned the particular practice in question.

Finally, it seems to me in any event that the State *has* given its approval to Metropolitan Edison's termination procedures. The State Utility Commission approved a tariff provision under which the company reserved the right to discontinue its service on reasonable notice for nonpayment of bills.

The majority attempts to make something of the fact that the tariff provision was not challenged in the most recent Utility Commission hearings, and that it had apparently not been challenged before. But the provision had been included in a tariff required to be filed and approved by the State pursuant to statute. That it was not seriously questioned before approval does not mean that it was not approved. It suggests, instead, that the Commission was satisfied to permit the company to proceed in the termination area as it had done in the past. The majority's test puts potential plaintiffs in a difficult position: if the Commission approves the tariff without argument or a hearing, the State has not sufficiently demonstrated its approval and support for the company's practices. If, on the other hand, the State challenges the tariff provision on the ground, for example, that the "reasonable notice" does not meet the standards of fairness that it expects of the utility, then the State has not put its weight behind the termination procedure employed by the company, and again there is no state action. Apparently, authorization and approval would require the

kind of hearing that was held in *Pollak,* where the Public Utilities Commission expressly stated that the bus company's installation of radios in buses and streetcars was not inconsistent with the public convenience, safety, and necessity. I am afraid that the majority has in effect restricted *Pollak* to its facts if it has not discarded it altogether.[3]

C

The fact that the Metropolitan Edison Co. supplies an essential public service that is in many communities supplied by the government weighs more heavily for me than for the majority. The Court concedes that state action might be present if the activity in question were "traditionally associated with sovereignty," but it then undercuts that point by suggesting that a particular service is not a public function if the State in question has not required that it be governmentally operated. This reads the "public function" argument too narrowly. (The whole point of the "public function" cases is to look behind the State's decision to provide public services through private parties.) See *Evans* v. *Newton,* 382 U. S. 296 (1966); *Terry* v. *Adams,* 345 U. S. 461 (1953); *Marsh* v. *Alabama,* 326 U. S. 501 (1946). In my view, utility service is traditionally identified with the State through universal public regulation or ownership to a degree sufficient to render it a "public function."

[3] I cannot accept the majority's characterization of *Pollak* as not necessarily deciding the state-action question there presented. *Ante,* at 356. Whatever doubt on that score may have been created by the original opinion has long since been resolved by this Court. See *Evans* v. *Newton,* 382 U. S. 296, 301 (1966); *id.,* at 319–320 (Harlan, J., dissenting); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 119 (1973) (opinion of BURGER, C. J.); *id.,* at 133 (STEWART, J., concurring).

I agree with the majority that it requires more than a finding that a particular business is "affected with the public interest" before constitutional burdens can be imposed on that business. But when the activity in question is of such public importance that the State invariably either provides the service itself or permits private companies to act as state surrogates in providing it, much more is involved than just a matter of public interest. In those cases, the State has determined that if private companies wish to enter the field, they will have to surrender many of the prerogatives normally associated with private enterprise and behave in many ways like a governmental body. And when the State's regulatory scheme has gone that far, it seems entirely consistent to impose on the public utility the constitutional burdens normally reserved for the State.

Private parties performing functions affecting the public interest can often make a persuasive claim to be free of the constitutional requirements applicable to governmental institutions because of the value of preserving a private sector in which the opportunity for individual choice is maximized. See *Evans* v. *Newton, supra,* at 298; H. Friendly, The Dartmouth College Case and the Public-Private Penumbra (1969). Maintaining the private status of parochial schools, cited by the majority, advances just this value. In the due process area, a similar value of diversity may often be furthered by allowing various private institutions the flexibility to select procedures that fit their particular needs. See *Wahba* v. *New York University,* 492 F. 2d 96, 102 (CA2), cert. denied, *post,* p. 874. But it is hard to imagine any such interests that are furthered by protecting privately owned public utility companies from meeting the constitutional standards that would apply if the companies were state owned. The values of pluralism and diversity are

simply not relevant when the private company is the only electric company in town.

## II

The majority's conclusion that there is no state action in this case is likely guided in part by its reluctance to impose on a utility company burdens that might ultimately hurt consumers more than they would help them. Elaborate hearings prior to termination might be quite expensive, and for a responsible company there might be relatively few cases in which such hearings would do any good. The solution to this problem, however, is to require only abbreviated pretermination procedures for all utility companies, not to free the "private" companies to behave however they see fit. At least on occasion, utility companies have failed to demonstrate much sensitivity to the extreme importance of the service they render, and in some cities, the percentage of error in service termination is disturbingly high. See *Palmer* v. *Columbia Gas Co. of Ohio, Inc.,* 342 F. Supp. 241, 243 (ND Ohio 1972), aff'd, 479 F. 2d 153 (CA6 1973); *Bronson* v. *Consolidated Edison Co.,* 350 F. Supp. 443, 448 (SDNY 1972).[4] Accordingly, I think that at the minimum, due process would require advance notice of a proposed termination with a clear indication that a responsible company official can readily be contacted to consider any claim of error.

## III

What is perhaps most troubling about the Court's opinion is that it would appear to apply to a broad range of claimed constitutional violations by the company. The Court has not adopted the notion, accepted elsewhere, that different standards should apply to state-

---

[4] In *Bronson,* Judge Tyler noted that the state utility commission had found that 16% of the complaints investigated resulted in adjustments in favor of the customer. 350 F. Supp., at 448 n. 11.

action analysis when different constitutional claims are presented. See *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 190–191 (1970) (BRENNAN, J., concurring and dissenting); *Grafton* v. *Brooklyn Law School*, 478 F. 2d 1137, 1142 (CA2 1973). Thus, the majority's analysis would seemingly apply as well to a company that refused to extend service to Negroes, welfare recipients, or any other group that the company preferred, for its own reasons, not to serve. I cannot believe that this Court would hold that the State's involvement with the utility company was not sufficient to impose upon the company an obligation to meet the constitutional mandate of nondiscrimination. Yet nothing in the analysis of the majority opinion suggests otherwise.

I dissent.