**GREENSPAN et al., Plaintiffs,**

v.

**NATIONAL MEDICAL CARE, INC., et al., Defendants.**

**Civ. A. No. 79–1092–A.**

United States District Court, E. D. Virginia, Alexandria Division.

Jan. 28, 1980.

Jack McKay, Alexandria, Va., William A. Bradford, Jr., Hogan & Hartson, Washington, D.C., for plaintiffs.

M. Scott Hart, Mays, Valentine, Davenport & Moore, Richmond, Va., for National Medical Care, Inc., Bio-Medical Applications Management Company, Inc., Northern Virginia Dialysis Center, Inc.

John D. Grad, Hirschkop & Grad, Alexandria, Va., Daniel M. Clements, Arent, Fox, Kinter, Plotkin & Kahn, Washington, D.C., for Raphael J. Osheroff, M.D., Inc. and M.D.

## MEMORANDUM OPINION AND ORDER

OREN R. LEWIS, District Judge.

Dr. Robert E. Greenspan, an employee of Dr. Raphael J. Osheroff, was summarily discharged on December 12, 1979—on the same day, Dr. Steven Tolkan, another doctor-employee of Dr. Osheroff, upon learning of Dr. Greenspan's discharge, resigned from Osheroff's employ.

This complaint for temporary and permanent injunctive relief and for treble damages for violations of the antitrust laws followed on December 18, 1979.

On December 27, 1979, the plaintiffs moved for the entry of a temporary restraining order, restraining the defendants from preventing plaintiffs' access to the Northern Virginia Dialysis Center (NVDC) for dialysis treatment and further restraining defendants from interfering with the rights of the plaintiffs Anderson, Benedicto, Hall and Wolfe to choose to be treated by Doctors Greenspan and Tolkan.

The Court bifurcated the antitrust claims and set the case on January 8, 1980 for an expedited evidentiary hearing on the prayer for a permanent injunction, and on the merits for all of the non-antitrust claims.

Upon hearing the evidence and arguments of counsel, the Court denied the plaintiffs' motion for a permanent injunc-

tion and dismissed the non-antitrust charges.

Counsel was advised that the court would file its findings and conclusions as soon as possible.

### FINDINGS

From the record thus made, the Court finds that Doctors Osheroff, Greenspan and Tolkan are licensed Virginia physicians specializing in nephrology.

Anderson, Benedicto, Hall and Wolfe are dialysis patients receiving thrice-weekly treatments at NVDC.

National Medical Care, Inc. (NMC), and its subsidiary Bio-Medical (BMA), own the controlling interest in some 125 dialysis centers in the United States, including eight out of 11 such facilities in the Washington-Metropolitan area.

NVDC was founded and owned by Dr. Osheroff, Inc.—he sold it, together with his services as exclusive medical director for ten years, to NMC and its subsidiary for $800,000 and 40% of the net income (after taxes) NMC received from its Alexandria, Fredericksburg and Warrenton dialysis centers.

The sales contract provided that Dr. Osheroff would have exclusive rights, directly or through other qualified physicians selected by him, to provide medical services for patients at the said dialysis centers—the Doctor to bill his patients directly through their third-party insurers and to the Medicare ESRD Program under the alternative capitation method of reimbursement. The agreement also contained a covenant not to compete.

The number and location of dialysis centers in Virginia are determined by the State on the basis of need (§ 32.1–93 Code of Virginia)—they must be "provider approved" by HEW to be eligible for ESRD Medicare reimbursement—(HEW pays the owners of the dialysis equipment $138.00 and the attending physician $12.00 per treatment).

All dialysis centers are privately owned, maintained and operated.

Some patients own and/or lease home dialysis equipment.

Most of the Metropolitan hospitals own and maintain dialysis machines for both "in hospital" and out-patient treatment.

There are 11 privately-owned dialysis centers in the Metropolitan-Washington area, in addition to those in the hospitals offering out-patient service, eight of which are owned and operated by NMC and its subsidiaries—the remainder are owned and operated by other private entities.

All provide renal dialysis to any patient suffering from end stage renal disease.

Some dialysis centers, including those owned and operated by NMC in Metropolitan Washington, furnish company-employed nephrologists to treat their patients—others allow hospital-approved private nephrologists to treat their patients at the Center.

Renal dialysis is a relatively routine procedure administered by medical technicians and nurses.

Neither in-house nor private nephrologists are seldom, if ever, present when the patient is attached to the dialysis machines—all of the nephrologists that testified in this case have so stated.

Dr. Greenspan, while acting as medical director of NVDC during Dr. Osheroff's absence, said he did not usually make his rounds until some two hours after the patients were attached to the machines. Few, if any, of the nephrologists, both in-house and private, are at the dialysis centers while the patients are being dialyzed—all are on call by telephone or beeper, when and if needed.

Doctors Greenspan and Tolkan, both recent medical school graduates, were hired by Dr. Osheroff pursuant to oral contract in mid-1978 to assist him in his private nephrology practice at NVDC.

Dr. Greenspan discussed the possibility of becoming Dr. Osheroff's partner.

In late 1978, Dr. Osheroff withdrew from both his private and NVDC nephrology practice to seek psychiatric help. Before so doing, he made arrangements with Dr.

Greenspan to take over his office, hospital and consultation practice, as well as his duties as medical director of NVDC, until he returned or sold his business.

In March of 1979, he requested NMC to allow Dr. Greenspan to be the acting medical director of NVDC during his absence. This request was granted.

In late November of 1979, Dr. Osheroff regained his health and resumed his private and NVDC practice, and was reinstated by NMC as the medical director of NVDC on 12/6/79.

In March of 1979, Dr. Greenspan caused to be prepared a set of by-laws for NVDC, which he captioned "Medical Staff By-Laws". These by-laws purported to govern, among other things, the admission and discharge of staff physicians. They were never presented to or approved by the Board of Directors of NVDC, NMC or Dr. Osheroff, Inc.—and were never put into effect—no nephrologists practicing in Northern Virginia were made aware of their existence.

During the summer and fall of 1979, Dr. Greenspan tried to buy Dr. Osheroff's interest in NVDC. When they could not agree upon the purchase price, Dr. Greenspan wanted to buy the right to treat half of the present patients and such others that he brought to the Center. They were never able to agree upon the purchase price.

While these discussions were going on, Dr. Greenspan told the Chairman of the Board of NMC that if he would refuse to reinstate Dr. Osheroff as the medical director of NVDC, it would greatly facilitate his negotiations for the purchase of the clinic.

He also discussed with the Chairman during the summer of 1979, the prospects of opening other dialysis centers in Washington, Montgomery County and Woodbridge, Virginia.

When the Chairman of the Board learned that Dr. Greenspan was going ahead with his Woodbridge application, he told the Doctor he would not be allowed to continue as Acting Medical Director of NVDC.

When the Chairman showed no interest in aiding him, Dr. Greenspan stated he would take NVDC's patients with him to his Woodbridge clinic. (Virginia approved Dr. Greenspan's Woodbridge application on January 8, 1980.)

Dr. Greenspan continued, after he was discharged, to call on all of NVDC patients while they were being dialyzed and got 63 out of 96 of them to sign the following statement (it was typed on NVDC stationery):

TO WHOM IT MAY CONCERN:

I, _____, currently a patient undergoing chronic hemodialysis at the Northern Virginia Dialysis Center, do hereby declare that I will not accept any medical services from Raphael J. Osheroff, M.D. and am under the care of Robert E. Greenspan, M.D. for any and all medical services associated with my therapy at the Northern Virginia Dialysis Center in Alexandria, Virginia.

_____
Signature of Patient

_____
Signature of Witness

_____
Date Signed

### CONCLUSIONS

This is not a class action for the benefit of Northern Virginia nephrologists and those suffering from end stage renal disease.

It is a private action for a temporary and permanent injunction ordering the defendants to grant Doctors Greenspan and Tolkan staff privileges at NVDC, Inc. to treat patients on their dialysis machines—and for a temporary and permanent injunction ordering the defendants to permit the lay plaintiffs Anderson, Benedicto, Hall and Wolfe to choose, if they desire, Dr. Greenspan and Dr. Tolkan to treat them on the dialysis machines at NVDC, and to permit them to indicate this choice to third-party payer of services—and for money damages.

■ The plaintiffs have no such rights under the Constitution of Virginia or the

Constitution of the United States. NVDC is privately-owned and maintained—Virginia only determined the location and need therefor—the United States does nothing more than provide coverage under Medicare for persons who suffer from end stage renal disease.

HEW control over ESRD facilities, including control over personnel matters, is expressly left to the facility's governing body. 42 C.F.R. § 405.2136.

This falls short of the requisite state action relied upon by the plaintiffs to support their claimed deprivation of constitutional rights.

The two most recent Supreme Court decisions of significance addressing the distinction between private and state actions are *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) and *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). The Supreme Court said in *Jackson :*

> The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.

In 1978, the Fourth Circuit Court of Appeals in *Trageser v. Libbie Rehabilitation Center,* 590 F.2d 87 (4th Cir. 1978) held that a private nursing home's receipt of payments for services rendered under Medicaid, Medicare, Veterans Administration and other welfare programs did not support a finding of state action. They said in *Walker v. Pierce,* 560 F.2d 609 (4th Cir. 1977):

> We have previously held that the receipt of Medicaid funds does not convert private medical care to state action.

There is no evidence in this case that the lay plaintiffs or anyone suffering from end stage renal disease have been denied equitable access to dialysis services rendered by NVDC, or that the defendants have forced them to transfer to other dialysis centers for other than medical reasons in violation of the regulations promulgated by HEW (42 CFR § 405.2136(b)(3)).

■ To the contrary, all of the lay plaintiffs are now being dialyzed at NVDC— they went there voluntarily and are free to leave and seek admission to any of the other dialysis centers in the Metropolitan area or to seek dialysis treatment as out-patients at most of the area hospitals. They are also free to seek admission to the soon-to-be-opened Greenspan Dialysis Center in Woodbridge, Virginia. The claim that denial or withdrawal of a physician's staff privileges at a particular hospital and/or dialysis center denies his patients the right to select a physician of their choice has been considered by several state courts and has been rejected by all of them—the right to choose a physician simply does not go as far as the lay plaintiffs here claim. It clearly does not extend to treatment at a particular facility by a physician who is not admitted to practice therein.

These lay patients were not Dr. Greenspan's nor Dr. Tolkan's patients when they were treating them at NVDC—they were Dr. Osheroff's patients. They did not express a preference for Dr. Greenspan until he asked them to sign the "To Whom It May Concern" letter after he was discharged.

Dr. Greenspan's and Dr. Tolkan's claim their dismissal from the staff of NVDC is tantamount to a deprivation of their right to practice their profession is not supported by authorities.

■ The Fourteenth Amendment does not assure doctors of an unlimited right to practice on the staff of a particular hospital. See *Hayman v. City of Galveston,* 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927).

It was enunciated by the Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), that the liberty interest in employment protected by the Fourteenth Amendment is impaired in only two instances, neither of which are applicable to the findings here made. NVDC has not done anything to prevent these doctors from practicing their chosen profession. They have only denied them the right to practice their profession at NVDC. Both doctors are in fact practicing their profession in internal medicine

and nephrology. Neither has produced any evidence that the defendants have done anything to prohibit them from applying for and receiving staff privileges at any of the metropolitan hospitals. The record discloses that Dr. Greenspan has applied for staff privileges at BMA's facilities at Dupont Circle and in Arlington, and that he will soon open his privately-owned dialysis center at Woodbridge, Virginia.

Dr. Greenspan's claim that his termination of staff privileges at NVDC violates the rules and by-laws of NVDC are not supported by fact or law. NVDC had no such by-laws when he was employed by Dr. Osheroff—he admits he had no contractual relationship of any kind with NVDC, BMA or NMC—the by-laws Dr. Greenspan relies upon were made by him while he was Acting Medical Director of NVDC. They were neither submitted to nor adopted by any of the corporations.

Dr. Tolkan clearly has no constitutional right to staff privileges at NVDC. He admits he voluntarily gave up any rights he had when he resigned solely because Dr. Greenspan had been summarily discharged.

Neither of these doctors seek back pay or reinstatement as employees of Dr. Osheroff, Inc. or as the acting medical director of NVDC.

Their claim at best is for breach of their oral employment contract with Dr. Osheroff, Inc. Dr. Osheroff, Inc. did not terminate Dr. Tolkan's contract of employment. He terminated it when he resigned. Even though Dr. Greenspan's contract of employment was terminable at will, the findings here made disclose Dr. Osheroff had ample cause to summarily discharge him.

The plaintiffs having voluntarily dismissed the antitrust charges, Counts II, III and IV, without prejudice, nothing further remains to be done herein.

Therefore, this case should be DISMISSED and STRICKEN from the Docket of this Court, at the costs of the plaintiffs, and

It Is So Ordered.