John R. MURPHY and John P. McCrank, Plaintiffs,

v.

SOCIETY OF REAL ESTATE APPRAIS-ERS, an unincorporated association, et al., Defendants.

No. 75-C-24.

United States District Court, E. D. Wisconsin, Milwaukee Division.

Feb. 7, 1975.

Thomas St. John and John D. Finerty, Samson, Friebert, Finerty & Burns, Milwaukee, Wis., for plaintiffs.

## 1048

Geoffrey Greiveldinger, Foley & Lardner, Milwaukee, Wis., for defendants.

## MEMORANDUM AND ORDER

WARREN, District Judge.

This is an action brought by two real estate appraisers in an effort to enjoin and instill various procedural formalities into a disciplinary proceeding that has been instituted against them by the Society of Real Estate Appraisers (hereinafter referred to as the society).

The society is a private unincorporated association with headquarters in Chicago, Illinois; the plaintiffs are currently members[1] of the society who have been subjected to the initial investigatory phases of what may prove to be a serious disciplinary proceeding. The plaintiffs bring this action against the society and five individual members of the Professional Practice Committee of the Milwaukee Chapter of the society; they present claims for relief that arise under the provisions of the Constitution of the United States. The action is brought under 28 U.S.C. § 2201 and 42 U.S.C. § 1983; jurisdiction is alleged to exist in this Court through 28 U.S.C. §§ 1331 and 1343.

On January 13, 1975, the plaintiffs filed their complaint and a motion for a temporary restraining order. Proper notice was issued, briefs and affidavits were submitted on behalf of each party, and a hearing was held on January 17 where counsel argued their respective positions as to the propriety of the issuance of preliminary relief.

## I. FACTUAL BACKGROUND

A review of the thorough briefs that have been filed, as supplemented by the oral argument that has been heard, reveals that the following factual circumstances have been established.

The defendants named above have attempted to institute an investigation into the conduct of the named plaintiffs as professional real estate appraisers. As an initial step in the procedure, the Milwaukee Chapter of the society caused a notice to be mailed to the plaintiffs on November 19, 1974; this notice described various parcels of realty, requested that the plaintiffs appear before the Professional Practice Committee of the Milwaukee Chapter at a specified date and time, and asked that true copies of relevant appraisal reports be supplied along with any relevant supporting data. The notice stated that the purpose of this meeting was to "conduct an investigation" into the appraisal reports that had been made by the plaintiffs on the particular parcels therein described.

Amended letters of notification were sent by the chapter on December 13, 1974. The amended notices stated that the investigatory meetings would be held on January 17, 1975, thereby allowing the full 30 days of preparation to which the plaintiffs were entitled under the rules issued by the society.[2]

Prior to the meetings set for January 17, this action was filed; the plaintiffs have requested that this Court enjoin the meetings until a hearing on the merits of their claims can be held, or in the alternative, until a motion for a preliminary injunction can be filed and argued.

Counsel for the defendants has stated that the meetings at issue here will be voluntarily stayed by the Milwaukee Chapter of the society, pending a decision by this Court on the motion for the

---

[1]. Because the plaintiffs are not of equal rank within the society, a question has been raised as to whether they are both "members" subject to this investigative process. The procedure for disciplinary investigations such as is at issue here is governed by a society publication denominated "Regulation No. 5 Disciplinary Rules and Procedure." Pertinent portions of this document have been submitted to the Court, attached as Exhibit A to the affidavit of one Lyle W. Larcheid; the term "member" is defined by Rule 5.1060, and clearly includes both the Associate-Member and the Senior-Member.

[2]. See Rule 5.6160, of the Disciplinary Rules and Procedure noted above. The letters of notification that were initially mailed were cancelled by the society when plaintiffs' counsel brought this rule to the attention of the Milwaukee Chapter and noted that only 27 days had been given.

temporary restraining order; he requests that the motion currently before the Court not be considered one for a preliminary injunction so as to enable him to present additional factual evidence in opposition to the issuance of such an injunction. The Court will limit the form of its ruling here to the motion for the temporary restraining order that has been filed by the plaintiffs, although, as a practical matter, it is generally thought that where the opposing party has had notice of the application for a temporary restraining order, the application does not differ functionally from a motion for a preliminary injunction. A temporary restraining order, like a preliminary injunction, is an extraordinary remedy which will not be granted unless there is a clear showing of both probable success and irreparable injury. *See,* Norwalk Core v. Norwalk Board of Education, 298 F.Supp. 203, 206 (D.Conn., 1968); Dilworth v. Riner, 343 F.2d 226, 229 (5th Cir., 1965).

## II. THE NATURE OF THE SHOWING REQUIRED TO OBTAIN A TEMPORARY RESTRAINING ORDER

A review of the relevant authorities convinces this Court that four basic elements must be considered prior to the issuance of a temporary restraining order under the provisions of Rule 65(b), Federal Rules of Civil Procedure:

(1) Plaintiffs' showing that without such relief they will be irreparably injured;

(2) The public interest, on balance;

(3) Possible harm to other interested parties; and

(4) Plaintiffs' likelihood of success on the merits of their contentions.

*See, e.g.,* Ann Arbor Railroad Company v. United States, 358 F.Supp. 933, 935 (E.D.Penn., 1973).

The defendants urge that the facts of this case cannot be said to establish the requisite showing of irreparable harm to the plaintiffs, and they maintain that the law is such as to preclude a finding

of any reasonable likelihood of success on the merits of the contentions raised.

The Court is of the opinion that the application for the temporary restraining order can be resolved by consideration of only one of the four elements named above: absent a showing of reasonable probability of success on the merits, no such order can issue. *See, e. g.,* Playgirl Lounge, Inc., et al. v. Town of Layfayette, et al., 333 F.Supp. 736 (E.D.Wis., 1971).

Because the Court is of the opinion that no reasonable probability of success on the merits of both of two critical contentions has been demonstrated, the application for the temporary restraining order will be denied.

(A) *No Reasonable Probability of Success as to the Contention that "State Action" Exists.*

In order to prevail on the claims that § 1983 provides a cause of action here and that the fourteenth amendment serves to protect the plaintiffs, it must be established that state action exists.

In cases arising under 42 U.S.C. § 1983, the requirement that the deprivation be inflicted "under color of law" has been consistently treated by the courts as identical to the "state action" required by the terms of the fourteenth amendment. *See, e.g.,* Bright v. Isenbarger, 314 F.Supp. 1382, 1389 (N.D. Ind., 1970), citing United States v. Price, 383 U.S. 787, 794 at note 7, 86 S. Ct. 1152, 16 L.Ed.2d 267 (1966). A finding that no state action is present in this case would have a fatal impact: no cause of action would exist under 42 U. S.C. § 1983, no jurisdiction would lie under 28 U.S.C. § 1343, and, even if alternative means of establishing a cause of action and jurisdiction were to exist, the plaintiffs' claims would be foreclosed on their merits because the provisions of the fourteenth amendment would not be applicable.

In their attempt to establish state action in this case, the plaintiffs argue that the State of Wisconsin has by stat-

ute recognized this society as a licensing authority for real estate appraisers; it is urged that a statutory delegation of duty has transformed the action of the private society into that of the state. For the reasons that follow, the Court cannot agree.

The United States Supreme Court has handed down a most recent decision dealing with the question of when the activity of a private organization can be attributed to the state which it is purported to represent; this Court must be guided by the principles set forth therein. *See:* Jackson v. Metropolitan Edison Company, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *see too,* Bright v. Isenbarger, supra, 314 F.Supp. at p. 1392 et seq. (a thorough analysis of the history and application of the state action doctrine presented by Chief Judge Eschbach).

It is clear that as a part of the complex scheme regulating state savings and loan associations, the Commissioner of Savings and Loan has been given the duty to approve those appraisers who are to perform real estate appraisals for state savings and loan associations. Wis.Stats. § 215.21(9). To fulfill his obligation, the Commissioner has determined that real estate appraisers may be deemed "approved" in a variety of ways: approval may be obtained by membership in "a recognized professional appraisal group organization or society . . . "; approval may also be obtained if the appraiser has done at least ten years of appraisal work, or possesses training and experience sufficient to convince a board of directors of savings and loan institution that he is qualified to perform appraisal duties. *See,* Wisconsin Administrative Code § S–L 18.-05(1)(a).

The plaintiffs contend that the statute and regulation heretofore described have effected a situation whereby the State of Wisconsin has delegated to the society the task of determining who will be approved as an appraiser for purposes of § 215.21(9); they urge that since the society has the authority to determine who will maintain membership therein it necessarily performs a function sanctioned by and under color of state law.

■ The Court notes that state action can be shown to exist either by proof that a private entity performs a "public function," or by proof that the activities of the state are inextricably intertwined with those of the private organization. While the plaintiffs have not clearly set forth their claims in such a bifurcated analysis, what they do urge lends itself to such an approach; the Court will consider their contentions in terms of these two theories.

In the *Jackson* case, noted above, the Supreme Court felt that it was necessary to review those cases which had theretofore created the "public function" theory of state action; the Court believed that it was being given an invitation to "expand" the public function doctrine to fit the facts of the case then before it. *See,* Jackson v. Metropolitan Edison Co., *supra,* 419 U.S. at p. 352, 95 S.Ct. 449.

In declining to accept such an expanded interpretation, the Court held that to establish that state action exists because an entity performs a public function, it is not enough to show that that entity is engaged in what may be thought to be an essential public service; the Supreme Court felt that it was incorrect to state that, as a broad principle, all businesses "affected with the public interest" are state actors in all their actions:

"Doctors, optometrists, lawyers, Metropolitan and *Nebbia's* upstate New York grocery . . . are all in regulated businesses, providing arguably essential goods and services, 'affected with a public interest.' We do not believe that such a status converts their every action, absent more, into that of the State." [Citations Omitted.] Jackson v. Metropolitan Edison Co., *supra,* 419 U.S. at p. 354, 95 S.Ct. at p. 455.

■■ In light of this language, the Court finds that although this society performs a service that is to some ex-

tent recognized by the state, this fact alone cannot transform its actions into those of the state for purposes of the fourteenth amendment. Unless it can be shown that the activity that is at issue is one that is "traditionally associated with sovereignty," within the meaning of the *Jackson* decision, state action is not to be implied under the public function theory. *See* Jackson v. Metropolitan Edison Co., *supra,* 419 U.S. at p. 353, 95 S.Ct. 449.

As to the argument that the state has become "intertwined" with the society by virtue of its alleged "delegation" of authority to grant approval to perform real estate appraisal, the Court would think that if the complex regulatory framework that was specifically applicable to the entity in the *Jackson* case did not create state action there, it follows *a fortiori* that state action cannot be said to exist where, as here, simple reference is made by statute to recognized professional societies in general. *See,* Wisconsin Administrative Code § S–L 18.05(1)(a) 1.

■ As noted in *Jackson,* the inquiry must be whether there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself. Jackson v. Metropolitan Edison Co., *supra,* 419 U.S. at p. 351, 95 S.Ct. 449. The Court concludes that the record in this case, in its current state, is not such as to establish that there is a reasonable probability that such a nexus exists here. The minimal contacts that ex-

ist between the state and the society are simply too attenuated; they do not support the state action arguments that have been made.[3] *See,* Driscoll v. International Union, etc., 484 F.2d 682, 690 (7th Cir., 1973) [the "very activity" of a private entity that is challenged by a plaintiff must be supported by state action to activate the provisions of the fourteenth amendment]; and Anderson v. Louisiana Dental Association, et al., 372 F.Supp. 837 (M.D.La., 1974) [private dental association does not act under color of state law].

While a finding that no state action is present would justify dismissal of the action, the Court feels that such a ruling would be inappropriate at this time. The Court is cognizant of the view that the ultimate decision on the state action question requires a "detailed inquiry," and frequently "admits of no easy answer." Jackson v. Metropolitan Edison Co., *supra,* 419 U.S. at pp. 349–353, 95 S.Ct. 449 (cases cited).

"Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, et al., 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

In addition, the Court feels that the plaintiffs may wish to attempt to establish that approval to practice a profession, such as is at issue here, is an exercise of power that although delegated by the state is "traditionally associated with sovereignty," such that the state

---

3. If the Court were to follow the state action argument advanced by the plaintiffs here, it would seem to follow that any censorship proceeding that was conducted by this society anywhere in the nation would constitute state action under color of Wisconsin law because the particular subject would thereby risk loss of approval to practice real estate appraisal in the State of Wisconsin. Furthermore, if the Court were to accept the delegation argument that is urged here, the conclusion would be inescapable that the board of directors of the various savings and loan associations subject to

Wisconsin Administrative Code § S–L 18.-05(1)(a) also act under color of Wisconsin law when they vote to grant or refuse any individual the right to work as an appraiser for their firm; board approval is another means by which "approval" may be obtained under this regulation. See Wisconsin Administrative Code § S–L 18.05(1)(a)2.

It is the opinion of this Court that the relevant caselaw does not warrant an interpretation of the state action theory that would sweep as broadly as would this. See, Grafton v. Brooklyn Law School, 478 F.2d 1137, 1143 (2d Cir., 1973).

action exists here by virtue of the fact that the society performed a public function.

For the foregoing reasons the Court will refrain from entering a finding that no state action is present in this case as a matter of law; the parties will be allowed to submit additional factual evidence and to substantiate their respective claims with additional legal argument, if they should so desire.

(B) *No Reasonable Probability of Success as to the Contention that Due Process has been Violated.*

Despite the fact that what has been said concerning the state action issue would justify a refusal to issue the restraining order sought here, the Court need not rest its decision on that basis alone. In addition to the state action problem, the Court is of the opinion that these plaintiffs have not demonstrated a reasonable probability of success on the merits of their claim that the procedures to be granted them here fall short of that which is required by the concept of due process of law: if the Court should assume, *arguendo*, that state action exists in this case, it would be necessary to deny the application for the temporary restraining order nonetheless.

As established by the affidavit of Lyle W. Larcheid, President of the Milwaukee Chapter of the society, a substantial and detailed procedure must be followed if the society is to impose any sanction whatsoever upon these plaintiffs.[4] The rules under which the society must operate require that an initial investigation be performed by the Professional Practice Committee of the local chapter, that, if sanctions are thereafter recommended, the member be given an opportunity for a full hearing before the Trial Committee of the local chapter, and that the results of these proceedings be sent to the International Professional Practice Committee in Chicago, Illinois, who must allow the member an opportunity to file a petition for leave to appeal prior to the imposition of any penalty.

At the initial investigatory stages, the member is issued a notice to appear and to provide data; at the hearing stage the member is granted various procedural protections, including at least thirty days notice of the charges to be pressed, the right to have witnesses summoned on request, and some limited rules of evidence and opportunity for assistance from legal counsel at the hearing itself; the International Professional Practice Committee must issue a written report of findings and opinions as to each particular of each charge if it is decided that sanctions are warranted. The member has thirty days from the receipt of these findings to file a petition for leave to appeal.

Despite the fact that this procedure provides the member with numerous protections at the hearing stage of the disciplinary proceeding, the plaintiffs focus their attack on its preliminary and investigative stages. They claim that the initial "meeting" to which they have been called must have certain specific procedural elements, although this meeting is only a step whereby the Professional Practice Committee decides if it will be necessary to pursue the formal hearing described above. The plaintiffs urge that the fourteenth amendment entitles them to procedural protections at the initial meeting with the Chapter Committee because they are there required to produce data and enter into discussion with their adversaries.

In support of their contentions, the plaintiffs rely on In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). The *Ruffalo* decision concerned a trial lawyer who had been suspended from practice by the Supreme Court of Ohio. The United States Supreme Court held that the order of suspension was to be reversed because the procedure by which the suspension was achieved did not comport with due proc-

---

4. See the detailed procedural steps outlined in "Regulation No. 5 Disciplinary Rules and Procedures" at Rule 5.7000 et seq.

ess of law; specifically, the Supreme Court found due process to be violated where the accused was compelled to testify prior to notification of the nature of the charges against him. Because the charges that eventually resulted in suspension were formulated by means of the testimony given by the accused at his initial investigation, 'the Court felt that the proceedings were fatally defective:

> "These are adversary proceedings of a quasi-criminal nature. [citation omitted] The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused." In re Ruffalo, 390 U.S. 544, 551, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117 (1968).

The plaintiffs urge that the *Ruffalo* decision is controlling here and that this Court should enjoin any attempts by the society to conduct investigatory meetings where its members are compelled to attend and to discuss their prior appraisals; the plaintiffs seek notification of the charges that have been made against them, and an opportunity to defend against those charges from the outset.

■ For the reasons that will follow, the Court is of the opinion that the procedures utilized by the society to conduct initial investigatory meetings with members do not reasonably establish a probable breach of the protection to which these plaintiffs are entitled under the provisions of the United States Constitution; the Court believes that the plaintiffs' reliance on *Ruffalo* is misplaced.

The *Ruffalo* decision seems distinguishable from the case at bar in certain fundamental respects: in *Ruffalo*, the charges were to be formulated after the investigating body had elicited recorded testimony from the suspected individual; in fact, the very charge that resulted in suspension was based upon the initial testimony that had been given. Here, on the other hand, the charges must be made before the investigation can occur; the complaint that initiates the investigatory process becomes the basis for the complaint used at the hearing.[5]

More importantly, however, the Court notes that in *Ruffalo* there was no opportunity for a hearing, other than when the suspected individual was compelled to testify. The Supreme Court specifically notes that the lower court's record and findings were the bases of the affirmation of the order of suspension and that there was no *de novo* hearing before the Court of Appeals. In re Ruffalo, *supra*, 390 U.S. at p. 549, 88 S. Ct. 1222. Here, on the other hand, there exists a rather complete procedure for notification and hearing subsequent to the initial meeting between the suspect and the local chapter. By virtue of this procedure, these plaintiffs are to be given the opportunity to defend themselves that was denied to the suspect in the *Ruffalo* case. These distinctions compel the Court to conclude that *Ruffalo* is not controlling here.

■ Speaking generally, the Court would note that the concept of procedural due process of law is a flexible one; it serves to ensure that fundamental fairness is observed when the state attempts to inflict a deprivation upon an individual. *See*, Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). To determine whether the proceedings at issue here comport with the requirements of due process, it is necessary to scrutinize the fairness of the entire process through which the deprivation is to be achieved. Lucas v. Wisconsin Electric Power Company, 466 F.2d 638 (7th Cir., 1972),

---

5. In order to initiate this investigation process, it appears to be necessary that some form of complaint have been filed. See Regulation No. 5 Disciplinary Rules and Procedure at Rule 5.6010 et seq. The rules of the society provide that a complaint is not to be regarded as valid until it has been investigated under the prescribed procedures. See Rule 5.2130.

cert. denied 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973).

 The degree to which the fourteenth amendment requires the state to observe procedural formalities is a function of both the nature of the proceeding and the nature of the deprivation that might possibly result. *See,* Hannah v. Larche, *supra,* 363 U.S. at p. 440, 80 S.Ct. 1502; *see too,* Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) and Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir., 1961), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961) [due process and student disciplinary proceedings]; Duby v. American College of Surgeons, 468 F.2d 364, 368 (7th Cir., 1972) [due process and expulsion from a professional society].

In that we are here dealing with an administrative proceeding, at most, and in that the maximum possible deprivation is expulsion from the society, foreclosing but one of the various ways in which the plaintiffs may become "approved" to practice real estate appraisal in Wisconsin, the Court cannot say that these plaintiffs are entitled to a complete set of procedural formalities before they are censored; to determine whether due process will be violated, it is necessary to view the protections they are to be given in light of the punishment that might be imposed.

It appears to the Court that, as the defendants urge, the plaintiffs here have sufficient procedural protection: the rules of the society provide for notice, confrontation, counsel, and adequate arbiters; the Court feels that more need not be required. *See,* Suckle v. Madison General Hospital, 499 F.2d 1364 (7th Cir., 1974) [termination of a physician's staff privileges may be accomplished with procedures that would be less than sufficient were it a criminal proceeding]. The Court is not convinced that the disciplinary process at issue here is fatally defective because the many procedural safeguards that are provided are preceded by some investigative inquiry on the part of the society.

The Court would note that administrative agencies and commissions have long had the power to conduct either formal or informal investigations prior to the issuance of any formal notice of charges to the individuals to be investigated or questioned; such an investigative power includes the ability to issue subpoenas to compel testimony and the production of records. *See, e. g.,* United States v. Woerth, 130 F.Supp. 930, 943 (N.D. Iowa, 1955); Van Teslaar v. Bender, 365 F.Supp. 1007 (D.Md., 1973).

The United States Supreme Court itself has held that no provision of the United States Constitution forbids the state to conduct investigation in this manner. Oklahoma Press Publishing Company v. Walling, 327 U.S. 186, 214, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *see too,* Hannah v. Larche, *supra.*

Professor Kenneth Culp Davis traces the investigative powers of state agencies in his thorough treatise on administrative law; he notes that repeated attacks made under various constitutional provisions have generally been unsuccessful, and he remarks on the wide latitude that courts have given agencies in the performance of these functions:

"One facet of the administrative power of investigation, says the Supreme Court, may be 'more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" 1 Davis, Administrative Law Treatise, § 3.04 at p. 179 (1958 ed.), citing United States v. Morton Salt Co., 338 U.S. 632, 642–643, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

In light of the authorities reviewed in this portion of the opinion, the Court finds that the plaintiffs cannot demonstrate that there is a reasonable probability that the procedures to be used by the society here stand in violation of constitutional protections to which they are entitled. The informal meetings that are under attack in this suit appear

to be no more than preliminary inquiries designed to determine whether it will be necessary to institute the complete disciplinary procedures that are required by the rules of the society; the meetings are analogous to the power that a state agency has to investigate complaints and to establish probable violation of laws or regulations.

So long as there is an opportunity for a full hearing, and so long as other fundamental aspects of due process are present, it seems difficult to conclude that the dictates of the fourteenth amendment will be breached.

If the Court were to assume without deciding that state action exists in this case—if the Court were to assume that the society was in effect an administrative branch of state government—the Court would not be able to conclude that there exists a reasonable probability that the procedure that operates here is in violation of the constitutional protection to which the plaintiffs are entitled.

### III. CONCLUSION

The Court would note that there are several issues that remain unresolved at this time: the defendants have urged that a temporary restraining order is improper because the plaintiffs have not demonstrated that irreparable harm will be suffered in its absence; the defendants have also contended that it is inappropriate to consider whether these disciplinary procedures comply with the concept of due process of law because the plaintiffs have failed to establish that they hold a "property" interest within the meaning of the most recent caselaw interpreting that term. *See*, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); and Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

In view of the conclusions that have been reached in this memorandum opinion, the Court finds that it need not deal with these issues at this time. The Court might assume that these questions would be decided adversely to the defendants, and still the plaintiffs would not be entitled to the relief they seek.[6]

For the foregoing reasons, the Court is of the opinion that the plaintiffs in this case have not made the showing required to obtain an order to temporarily restrain those activities of the defendants that are the subject of this suit; because the plaintiffs have not demonstrated a reasonable probability of success on the merits of their constitutional claims, the Court finds that this motion must be and is hereby denied.

---

6. The Court would note that it is cognizant of those cases that state that a person's good name, honor, integrity or reputation are an inherent aspect of "liberty" such that minimal requirements of due process must be satisfied where the government acts in derogation of those intangibles. See, e. g., Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), citing Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).