Thomas C. LANGLEY, Sr. and Alberta Langley and Thomas C. Langley, Jr., by his Mother and Next Friend, Alberta Langley and Kathy Ann Langley, by her Mother and Next Friend, Alberta Langley and Patricia H. Langley, by her Mother and Next Friend, Alberta Langley

v.

MONUMENTAL CORPORATION and Prince George's County, Maryland, a Body Corporate and Politic.

Civ. A. No. N–79–2144.

United States District Court, D. Maryland.

Aug. 25, 1980.

Fred R. Joseph, Burt M. Kahn, and Shelly E. Mintz, Hyattsville, Md., for plaintiffs.

Joseph M. Roulhac and Michael W. Lower, Baltimore, Md., for defendant Monumental Corp.

David S. Bliden, Associate County Atty. for Prince George's County, Maryland, Upper Marlboro, Md., for defendant Prince George's County, Maryland.

NORTHROP, Chief Judge.

This case is presently before the Court on the motions to dismiss of defendants Monumental Corporation (Monumental) and Prince George's County, Maryland (the County). Monumental is a Maryland corporation, and the successor corporation to Monumental Properties, Inc. Monumental is the owner and operator of the Montpelier Town and Country Apartments (Town and Country Apartments) in Laurel, Maryland. The plaintiffs are Mr. Thomas C. Langley, Sr., Mrs. Alberta Langley, and their children, Thomas C. Langley, Jr., aged 13, Kathy Ann Langley, aged 7, and Patricia H. Langley, aged 3. The Langleys are Maryland citizens and former lessees of the Town and Country Apartments. The Court heard oral argument on these motions on August 15, 1980.

Plaintiffs' complaint alleges that on May 9, 1972, the County Council of Prince George's County enacted a bill known as CB–1–1972, which created a County Human Relations Commission and which outlawed discrimination based upon certain characteristics, including age, in the sale and rental of housing. This latter provision was codified as Section 2–210 of the Prince George's County Code. On November 25, 1975, the County Council enacted a bill known as CB–125–1975 "to provide that any person may restrict occupancy of any dwelling to a person or persons of any specified age group." Section 2–210, as amended, in pertinent part, now reads as follows (the language of the amendment is underscored):

Sec. 2–210. <u>Sale or rental of housing; exception.</u>

(a) No person, whether acting for monetary gain or not, shall:

(1) Refuse to sell, lease, sublease, rent, assign or otherwise transfer, or refuse to negotiate for the sale, lease, sublease, rental, assignment or other transfer of the title, leasehold or other interest in any housing, or represent that housing is not available for inspection, sale, lease, sublease, rental, assignment or other transfer when in fact it is so available, or otherwise deny or withhold any housing from any person because of discrimination;[1]

(2) Include in the terms, conditions or privileges of any sale, lease, sublease, rental, assignment or other transfer of any housing, any clause, condition or restriction discriminating against any person in the use or occupancy of such housing because of discrimination; or,

(3) Discriminate in the furnishings of any facilities, repairs, improvements, or services, or in the terms, conditions, privileges, or tenure of occupancy of any person because of discrimination.

(b) Discrimination based on age as defined in Section 2–186 shall not be wrongful with regard to housing operated in connection with any medical, health or educational institution, or with regard to any domiciliary, retirement, or senior citizen home or housing, or with regard to any pre–school children's home or facility. Discrimination shall not be wrongful with

---

[1]. Section 2–186(3) of the Prince George's County Code defines "discrimination" as "acting, or failing to act, or unduly delaying any action regarding any person because of race, creed, color, sex, national origin, age (except as required by state or federal law), occupation, marital status, political opinion, personal appearance, or physical or mental handicap, in such a way that such person is adversely affected in the areas of housing, employment, law enforcement, education, financial lending, or public accommodations."

regard to the leasing of a room(s) or apartment(s) in an owner–occupied dwelling consisting of not more than three (3) rental units; . . . Notwithstanding the other provisions of this Section and in clarification of the provisions of this Division, a person may restrict occupancy of any dwelling or dwellings to a person or persons of any specified age group, provided a written report of such limitations of occupancy, identifying the specific units so affected, is filed with the Commission; and further, that the lease or tenure of occupancy of any person or persons occupying any dwelling which is designated as being restricted in occupancy to any specified age group shall not be terminated on the effective date of such designation because said person or persons do not meet such designated occupancy requirements, unless said person or persons shall have been offered another comparable dwelling for which said person or persons meet the designated occupancy requirements within · the same building or within another building within the same complex of buildings. The Commission shall be authorized to periodically inspect any dwelling for which a designated occupancy restriction report has been filed, as provided above in order to determine whether such dwelling is being maintained in accordance with the provisions of such occupancy restriction report.

On August 1, 1972, the Langleys moved into an apartment at the Town and Country Apartments located at 13028 Old Stagecoach Road. In February 1977, Monumental notified the Langleys that the apartment building at Old Stagecoach Road had been registered with the Human Relations Commission as a building to be restricted in occupancy to persons who were eighteen years of age or older, and that the Langleys would have to move to another building within the Town and Country Apartments which was not so restricted. In April 1977, the Langleys moved to an apartment in the Town and Country Apartments located at 13003 Mistletoe Springs Road. In September 1977, Monumental informed the Lang-

leys that all the buildings in the Town and Country Apartments had been registered with the Human Relations Commission as restricted in occupancy to persons who were eighteen years of age or older, and that the Langleys would be required to vacate their apartment by October 31, 1978, or face eviction through the judicial system of the State of Maryland. Although plaintiffs' lease expired before October 31, 1978, Monumental gave the Langleys a grace period in which to find new housing. Between September 1977 and November 1978, Monumental filled in the children's swimming pool with soil and removed the recreational equipment which had been provided for the children living at the Town and Country Apartments.

In July 1978, the Langleys moved out of the Mistletoe Springs Road apartment and moved into housing which is allegedly more expensive, more crowded, less convenient to schools and shopping, and less appropriate for the raising of a family than the Town and Country Apartments. In March and July 1979, Monumental rejected the Langleys' formal request to become residents of the Town and Country Apartments solely because Thomas C. Langley, Jr., Kathy Ann Langley, and Patricia H. Langley were below the age of eighteen.

Plaintiffs filed suit in this Court on November 15, 1979, seeking $100,000 in damages from Monumental and a declaratory judgment that Section 2–210, as amended, is unconstitutional. Specifically, plaintiffs contend that Section 2–210, as amended, violates the Equal Protection Clause of the fourteenth amendment because 1) it permits a withholding of state benefits and protections from a specified age class without a compelling state interest; and, 2) it is arbitrary and unreasonable since it bears no substantial relationship to the public health, safety, and general welfare of the citizens of Prince George's County. Plaintiffs also argue that Section 2–210, as amended, violates the Due Process Clause of the fourteenth amendment because 1) it infringes upon their fundamental right to bear, raise, and keep children, and severely inhibits

their fundamental right to maintain their children within the family unit, without a compelling state interest; 2) it is not rationally related to a permissible state purpose; and, 3) it creates an irrebuttable presumption that children are undesirable tenants. Plaintiffs' suit against both Monumental and the County is brought directly under the fourteenth amendment. Jurisdiction is premised upon 28 U.S.C. § 1331, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure.

### Monumental's Motion to Dismiss

■ Monumental argues that this Court lacks subject matter jurisdiction over the case asserted against it. Initially, Monumental contends that neither 28 U.S.C. § 2201 nor Rule 57 of the Federal Rules of Civil Procedure provide a jurisdictional foundation for this action, since these provisions are procedural only and do not constitute separate and independent sources of federal jurisdiction. This contention is clearly correct. *Lake Lansing Special Assessment Protest, Ass'n v. Ingham County Bd. of Commrs*, 488 F.Supp. 767 (W.D.Mich. 1980); *Select Comm. on Presidential Campaign Activities v. Nixon*, 366 F.Supp. 51 (D.D.C.1973); *see Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Delavigne v. Delavigne*, 530 F.2d 598 (4th Cir. 1976). Monumental also protests that 28 U.S.C. § 1331 does not confer subject matter jurisdiction upon this Court. The basis of this argument is that this case cannot "aris[e] under the Constitution . . . of the United States. . . .", since plaintiffs' complaint indicates that they were the victims of private discriminatory conduct and therefore does not allege the "state action" necessary to invoke the protections of the fourteenth amendment.

■ It is, of course, axiomatic that a plaintiff must allege and prove "state action" to recover under the Due Process and Equal Protection Clauses of the fourteenth amendment. *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The Constitution erects no shield against merely private conduct, no matter how discriminatory or wrongful. *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). Recognizing this fundamental principle of constitutional law, plaintiffs argue that the County was sufficiently "inextricably intertwined" in Monumental's decisions to restrict the Town and Country Apartments to "adult only" status, and not to renew the Langleys' lease, to trigger the fourteenth amendment because Section 2–210, as amended, "authorized and encouraged" Monumental's conduct, and because the Human Relations Commission accepted, and thereby "approved," Monumental's occupancy restriction report.[2]

■ In *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), the Supreme Court held that a plaintiff confers subject matter jurisdiction upon a federal court by merely alleging that he has been deprived of a right secured to him by the Constitution. The two exceptions to this rule are when the alleged claim is immaterial and made solely for the purpose of obtaining jurisdiction or when it is wholly insubstantial and frivolous. *Id.* at 682–83, 66 S.Ct. at 776. Even if the allegations of the complaint suffice to vest the court with subject matter jurisdiction, the court must still examine the pleadings to determine whether they state a cause of action upon which relief can be granted. *Id.* In this case, it cannot be said that the constitutional claims are immaterial, for they provide the sole

---

**2.** Although the complaint alleges that the County Council and the County Human Relations Commission "approved" *all* the actions taken by Monumental, plaintiffs conceded at oral argument that this "approval" amounted to the enactment of Section 2–210, as amended, and the acceptance of Monumental's occupancy restriction report. As set forth *infra*, however, even if the County had "approved" all actions taken by Monumental, no "state action" would be present since the County did not *compel* Monumental's conduct.

basis for the relief sought. It also cannot be said that the allegations are wholly insubstantial and frivolous, although the Court deems this question to be a close one. Because clear Supreme Court precedent indicates that the allegations are insufficient as a matter of law to establish "state action," however, the case against Monumental must be dismissed for failure to state a claim upon which relief can be granted.

In *Burton, supra*, the Supreme Court promulgated the "symbiotic relationship" test for determining the presence of "state action." In *Moose Lodge, supra*, and *Jackson, supra*, the Supreme Court advanced a different theory for making this determination, the "close nexus" test. Although there is some question as to whether the "close nexus" test completely replaced the "symbiotic relationship" test, *see Lemberos v. Laurel Racecourse, Inc.*, 489 F.Supp. 1376, 1381 (D.Md.1980); *Greene v. Johns Hopkins University*, 469 F.Supp. 187, 198 (D.Md.1979), further exploration of this issue is unnecessary since the facts alleged in the complaint fall short of satisfying either test.

Judge Harvey of this Court recently summarized the *Burton* test and traced its application in subsequent Supreme Court cases, as follows:

Under [the symbiotic relationship] test, state action is present if "[t]he State has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." *Burton, supra* [365 U.S.], at 722, 81 S.Ct. at 860.

. . . . .

In *Burton*, the plaintiff sued a restaurant which had refused to serve him solely on racial grounds. The restaurant was located in an off–street automobile parking building which was owned and operated by the Wilmington Parking Authority, an agency of the State of Delaware, and which had been leased by the restaurant from the Authority. The Supreme Court found that the exclusion of the plaintiff by the restaurant because of his race constituted state action, and the Court held that plaintiff's rights under the Equal Protection Clause had been violated. In finding state action to be present, the Supreme Court attached significance to the following facts: that the land and the building were publicly owned, that the building itself was dedicated to "public uses" in performance of the Authority's essential government functions, that the costs of the land acquisition and construction of the building were defrayed by public funds, and that the upkeep and maintenance of the building were financed with public funds. The Supreme Court also noted that the peculiar relationship between the two entities conferred on each an incidental variety of material benefits. These benefits included the propinquity of the restaurant and the Agency, the availability of a tax exemption to the restaurant, and the crucial importance of restaurant profits to the financial success of the Agency.

In *Moose Lodge*, the Supreme Court held that no state action was involved in the refusal of a private club to serve individuals because of their race. The Court rejected the argument that the club's possession of a liquor license and the state's extensive regulation of liquor indicated the existence of state action. In distinguishing *Burton*, the Court emphasized that the defendant in *Moose Lodge* was a private club that conducted all of its activities in a building which it owed [sic]. The Court also noted that the Club was not publicly funded.

In *Jackson*, the Court found no state action involved when a utility company terminated service to a customer without affording her a hearing. Plaintiff had contended that state action was present because the defendant utility company was extensively regulated by the state and because the termination of service was permitted by a provision in the company's general tariff filed with the Public Utilities Commission. In analyzing the facts of that case, the Court noted that "[t]he mere fact that a business is subject

to state regulation does not by itself convert its action into that of the State for the purposes of the Fourteenth Amendment * * * Nor does the fact that the regulation is extensive and detailed, as in the case of most public utilities." *Jackson, supra*, 419 U.S. at 350, 95 S.Ct. at 453. In *Jackson*, the Supreme Court concluded that even though a state may grant a monopoly to a private party, that party's actions do not necessarily constitute state action. The Court specifically found a lack of the symbiotic relationship present in *Burton*. Noting that the defendant was privately owned, the Court held in *Jackson* that the defendant's acts in terminating service to its customers did not constitute state action, even though the utility was heavily regulated and enjoyed at least a partial monopoly. *Lemberos, supra*, 489 F.Supp. at 1381–82.

The allegations of the complaint clearly fail to establish any "position of interdependence" between the County and Monumental. Unlike the facts in *Burton*, neither the Town and Country Apartments, nor the land upon which they rest, are alleged to be publicly owned. The Apartments are not alleged to be dedicated to public uses, or to the performance of essential governmental functions. The costs of land acquisition and the construction of the buildings are not alleged to have been financed with public funds. The relationship between the two parties is not alleged to have conferred upon each an incidental variety of material benefits. Rather, like the facts in *Moose Lodge*, the defendant is a private entity. The decision to discriminate was privately made. *Burton* and the "symbiotic relationship" test therefore offer no solace to plaintiffs.

Under the "close nexus" test, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson, supra*, 419 U.S. at 351, 95 S.Ct. at 453; *Moose Lodge, supra*, 407 U.S. at 176, 92 S.Ct. at 1973. This test requires that the State be intimately involved in the challenged private conduct before that conduct becomes attributable to the State. *Lemberos, supra*, 489 F.Supp. at 1384. As set forth above, the Supreme Court in *Jackson* found no "state action" when a utility company terminated service to a customer without affording her a hearing, *despite the fact that the termination was permitted by a provision in the company's general tariff which the company had filed with the Public Utilities Commission.* The plaintiff argued that the termination constituted "state action" because the state Public Utilities Commission had "specifically authorized and approved" the termination practice. *Jackson, supra*, 419 U.S. at 354, 95 S.Ct. at 455. In concluding that such approval did not establish a "close nexus" between the utility's conduct and the State, the Supreme Court held:

> Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into "state action." At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so "state action" for purposes of the Fourteenth Amendment. (footnote omitted).

All of petitioner's arguments taken together show no more than that Metropolitan was a heavily regulated, privately owned utility, enjoying at least a partial monopoly in the providing of electrical service within its territory, and that it elected to terminate service to petitioner in a manner which the Pennsylvania Public Utility Commission found permissible under state law. Under our decision this is not sufficient to connect the State of

Pennsylvania with respondent's action so as to make the latter's conduct attributable to the State for purposes of the Fourteenth Amendment.

*Id.,* 419 U.S. at 357, 358, 95 S.Ct. at 457.

That the "close nexus" test cannot be satisfied by a showing that the private conduct is permitted under state law was reaffirmed in *Flagg Bros. v. Brooks, supra.* In *Flagg Bros.,* a warehouseman proposed to sell goods entrusted to it for storage to satisfy its warehouseman's lien, as permitted by Section 7–210 of the Uniform Commercial Code, which had been enacted by the State of New York. Plaintiffs brought suit against the warehouseman under 42 U.S.C. § 1983, seeking damages, an injunction against the proposed sales, and a declaration that such sales pursuant to Section 7–210 would violate the Due Process and Equal Protection Clauses of the fourteenth amendment. In affirming the district court's dismissal of the complaint on the grounds that it did not allege the requisite "state action," the Supreme Court held:

> Respondents further urge that Flagg Brothers' proposed action is properly attributable to the State because the State has authorized and encouraged it in enacting § 7–210. Our cases state "that a State is responsible for the . . . act of a private party when the State, by its law, has compelled the act." *Adickes,* 398 U.S. [144], at 170 [90 S.Ct. 1598, at 1615, 26 L.Ed.2d 142]. This Court, however, has never held that a State's mere acquiescence in a private action converts that action into that of the State. The Court rejected a similar argument in *Jackson,* 419 U.S., at 357 [95 S.Ct., at 456]:
>
> "Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the

proposed practice *by ordering it,* does not transmute a practice initiated by the utility and approved by the commission into 'state action.' " (Emphasis added.)

. . . [T]he State of New York is in no way responsible for Flagg Brothers' decision, a decision which the State in § 7–210 permits but does not compel, to threaten to sell these respondents' belongings.

*Flagg Bros., supra,* 436 U.S. at 164–65, 98 S.Ct. at 1737–38.

These cases make clear that the allegations of the Langleys' complaint do not satisfy the "close nexus" test. As in *Flagg Bros.* and *Jackson,* the initiative behind the challenged conduct in this case came from a private party, Monumental, and not from a governmental entity. The mere fact that Section 2–210, as amended, permitted Monumental to take these actions, (in that it did not prohibit them), is insufficient to transform Monumental's conduct into that of the County, since that section did not *compel.* Monumental's actions. *Flagg Bros., supra; Jackson, supra.* That the County Human Relations Commission "approved" Monumental's occupancy restriction report by accepting it as also constitutionally insignificant, just as was the Public Utilities Commission's "approval" of Metropolitan Edison's termination practice by accepting its general tariff. The "close nexus" test accordingly provides no support for the plaintiffs' position.[3]

Finally, plaintiffs contend that the "state action" requirement has been satisfied because Monumental threatened to invoke the Maryland judicial system to evict the Langleys, apparently for holding over beyond the term of their lease, if they did not vacate the Mistletoe Springs Road apartment by

---

**3.** Although plaintiffs stress that Section 2–210 authorizes Monumental's conduct only because the County amended Section 2–210 to remove its prohibition against age discrimination, plaintiffs have failed to cite any authority which indicates that this fact is of constitutional significance. Under *Flagg Bros.* and *Jackson,* the crucial question is whether state law

*compels* the challenged private conduct. Since Section 2–210, in its original form and as amended, did not compel Monumental's conduct, its history is irrelevant in determining whether Monumental's actions may be attributed to the County under the fourteenth amendment.

October 31, 1978, citing *Shelley, supra.* *Shelley*, however, fails to boost plaintiffs over the "state action" hurdle. In *Shelley*, the Supreme Court held that judicial *enforcement* of a racially restrictive covenant constituted "state action," *Shelley, supra*, 334 U.S. at 13–14, 18–19, 68 S.Ct. at 842, 844–845, and it is clear that "state action" was found because state judicial officers had placed the power of the state behind the covenant by giving it legal effect. *Id.* In this case, no state judicial officers are alleged to have enforced Monumental's conduct in any manner. Furthermore, even if eviction proceedings had been instituted, the Maryland judiciary would not have been enforcing Monumental's discriminatory conduct. It would have been enforcing Maryland's universally applicable law which bars tenants from holding over beyond the term of their lease. Second, because the *Shelley* rationale could potentially convert much purely private action into "state action," many courts have held that the mere use of a state's eviction procedures does not constitute "state action," at least when there has been no showing of other significant state involvement in the private conduct, when the challenged discrimination is not racial in nature, or when the courts are not thereby enforcing a covenant which is discriminatory on its face. *See Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Joy v. Daniels*, 479 F.2d 1236 (4th Cir. 1973); *Weigand v. Afton View Apartments*, 473 F.2d 545 (8th Cir. 1973); *Lavoie v. Bigwood*, 457 F.2d 7 (1st Cir. 1972); *McGuane v. Chenango Court, Inc.*, 431 F.2d 1189 (2d Cir. 1970); *Fallis v. Dunbar*, 386 F.Supp. 1117 (N.D.Ohio 1974), *aff'd*, 532 F.2d 1061 (6th Cir. 1976); *Mullarkey v. Borglum*, 323 F.Supp. 1218 (S.D.N.Y. 1970). None of these conditions are present in this case.

In sum, because plaintiffs' allegations do not establish, under any theory, the "state action" necessary to bring suit against Monumental under the fourteenth amendment, Monumental's motion to dismiss must be granted.

*The County's Motion to Dismiss*

■ The County has also moved to dismiss the case brought against it, asserting that it is moot and that the allegations of the complaint do not show that Section 2–210, as amended, violates the Equal Protection or Due Process Clauses of the fourteenth amendment. These contentions need not be addressed, however, for plaintiffs' inability to establish that the actions of Monumental should be treated as the actions of the County also mandates that the case against the County be dismissed.

This is clear from the Supreme Court's opinion in *Flagg Bros., supra.* In *Flagg Bros.*, although the plaintiffs originally brought suit only against the private warehouseman who threatened to sell its goods pursuant to Section 7–210 of the New York Uniform Commercial Code, the Attorney General of the State of New York intervened in the case *as a party defendant* to defend the constitutionality of that statute. *Flagg Bros., supra*, 436 U.S. at 154, 98 S.Ct. at 1732. After determining that Flagg Brothers' proposed conduct did not constitute "state action," even though New York had "authorized" that conduct by enacting Section 7–210, the Supreme Court, without reaching the constitutionality of Section 7–210, affirmed the district court's dismissal of the case *against all defendants*, stating:

> We conclude that the allegations of these complaints do not establish a violation of these respondents' Fourteenth Amendment rights by either Flagg Brothers *or the State of New York*. The District Court properly concluded that their complaints failed to state a claim for relief under 42 U.S.C. § 1983.

*Id.* at 166, 98 S.Ct. at 1738 (emphasis added). The dissenting opinion makes clear that the effect of the majority's "state action" holding was to bar review of the constitutionality of Section 7–210 itself, for this was perhaps the central criticism of the majority opinion voiced by the dissenters. *Flagg Bros., supra*, 436 U.S. at 176–79, 98 S.Ct. at 1743–45 (Stevens, White, and Marshall, JJ., dissenting). This result, however, flows inexorably from the conclusion that

the conduct of private parties, allowed by a statute enacted by the state, does not constitute "state action" within the meaning of the fourteenth amendment. Since the state has not "acted," there is no "state action" to review. Accordingly, the County's motion to dismiss must be granted.