DECISION
Before the Court for decision are (i) Plaintiffs' (hereinafter "the Optometrists") Motion for Summary Judgment as to Counts 1 and 2 of the Class Action Complaint, and (ii) Defendant's (hereinafter "NHPRI") Cross Motion for Summary Judgment as to the same counts, pursuant to Super. R. Civ. P. 56. By virtue of their Class Action Complaint, the Optometrists seek a declaration that NHPRI was obligated to comply with G.L. 1956 § 5-35-21.1 as it existed during the relevant time period of November 1, 2002 through July 14, 2005 (hereinafter "the Time Period"). In particular, the Optometrists allege that NHPRI acted in violation of § 5-35-21.1(b) — which requires equal rates of reimbursement for optometrists and physicians providing like services when public funds are involved — when it paid a lower rate of reimbursement to optometrists than physicians for performance of the same services during the Time Period.[1] Accordingly, the Optometrists seek a declaratory judgment from this Court that they were entitled to not be discriminated against by NHPRI with respect to rates of *Page 2 
reimbursement for optometric health care services that they provided to NHPRI's members during the Time Period.
In response, NHPRI argues that during the Time Period, the statutory requirement to pay equal rates of reimbursement for similar services applied only when contracts to provide eye care services involved the "expenditure of public funds." § 5-35-21.1(b) (emphasis added). Further, NHPRI asserts that because the funds used to reimburse its medical service providers — such as the Optometrists — are considered private funds, § 5-35-21.1(b), as it existed during the Time Period, was not applicable. Consequently, NHPRI maintains that the Optometrists' claims, as well as those of the entire class, should fail as a matter of law and summary judgment should be granted for NHPRI.
 I Facts Travel
The Optometrists brought their initial action pursuant to Super. R. Civ. P. Rule 23 on behalf of those medical service providers who contracted with NHPRI to provide optometric eye care services to NHPRI's members during the Time Period.[2] (Class Action Compl. ¶ 1.) NHPRI is a non-profit corporation licensed by the Rhode Island Department of Business Regulation to operate a health maintenance organization (hereinafter "HMO") and provide health insurance coverage to its participants. (Coburn Aff ¶ 4, ¶ 5); see also Answer ¶ 4. The State of Rhode Island Medical Assistance Program, referred to as Medicaid, is a federal and state funded program that pays for medical and health related services for eligible Rhode Islanders. (Class Action Compl. ¶ 8.) The State of Rhode Island Department of Human Services (hereinafter "DHS") is the state agency designated to operate the statewide medical assistance program, part of *Page 3 
which is referred to as the RIte Care program. Id.. ¶ 9. The main purpose of the RIte Care program is to ensure that certain eligible uninsured Rhode Island citizens have access to adequate health care services. Id.. ¶ 10; see also Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Exhibit 1. DHS receives state and federal public funding in order to operate the RIte Care program in the State of Rhode Island. Id.. ¶ 11.
Under the RIte Care program, DHS contracts with private HMOs to provide comprehensive health care services to eligible uninsured families and individuals. See Medical Assistance Program — Section 0348 — RIte Care Program, § 0348.05 (Rev. 10/2005); see also Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Exhibit 1. In order to provide the necessary health care services for its RIte Care enrollees, the HMOs enter into separate contracts with medical service providers — such as optometrists and physicians. See DHS Contract § 2.01.[3] In return for the provision of health care services, DHS pays the participating HMOs a capitated health insurance premium — a fixed amount per member each month, regardless of whether or not each NHPRI member actually utilizes health care services in a given month. (Coburn Aff ¶ 14); see also DHS Contract § 1.01, § 2.15, § 3.04.01.
NHPRI, a Medicaid-only HMO, has contracted with DHS since 1994 to provide health care benefits to RIte Care eligible Rhode Islanders. (Class Action Compl. ¶ 12.) Among the many benefits offered by NHPRI to its RIte Care eligible members is access to optometry services. (DHS Contract, Attachment A: Schedule of In-Plan Benefits 6.) *Page 4 
In return for fixed monthly capitation payments, NHPRI enters into separate contracts with medical service providers — including eye care practitioners — to provide the health care services contemplated in the contract between NHPRI and DHS. See Coburn Aff ¶ 28-31; seealso DHS Contract § 2.01. These separate contracts — referred to as "Medical Group Specialty Services Agreements" — contain NHPRI's agreement to pay the particular medical service provider at a specified rate in return for providing medical services to NHPRI enrollees. (Coburn Aff. ¶ 28,¶ 29.)
For most of its history, NHPRI generally paid the same reimbursement rates to optometrists and physicians for the same types of services rendered. (Coburn Aff. ¶ 35.) However, when NHPRI began to serve the population referred to as "Children with Special Needs," NHPRI's then existing current network of ophthalmologists was not equipped to meet the population's medical needs. Id. ¶ 36. As a result, NHPRI concluded that the only way it could persuade more ophthalmologists to participate was to increase the reimbursement rates for participating ophthalmologists. Id. NHPRI instituted this policy change on November 1, 2002 and was subsequently successful in increasing the number of ophthalmologists willing to treat NHPRI enrollees. Id. ¶ 37. NHPRI maintained this policy of reimbursing ophthalmologists at a higher rate than optometrists for similar services from November 1, 2002 until July 15, 2005 — when § 5-35-21.1(b) was amended to apply to "private funds."[4] Id. ¶ 39.
In July of 1994, just prior to DHS's enrollment of the first Rite Care eligible members, the Rhode Island General Assembly enacted an amendment to § 5-35-21.1 that *Page 5 
would eventually give rise to the instant matter. Prior to July of 1994, § 5-35-21.1 read as follows:
 Any contract providing for health care benefits, which calls for the expenditure of private or public funds, for any purpose involving eye care, which is within the scope of the practice of optometry, shall provide the recipients and/or beneficiaries the freedom to choose within the participating provider panel either an optometrist or physician to provide such eye care. This provision shall be applicable whether or not the contract is executed and/or delivered in or outside of the state, or for use within or outside of the state by or for any individuals who reside or are employed in the state.
P.L. 1988, ch. 245, § 2. The July 1994 amendment added the following language — designated as subsection (b):
 Provided, however, where such contracts call for the expenditure of public funds, for any purpose involving eye expenditure of public funds, for any purpose involving eye care, there shall be no discrimination as to the rate of reimbursement for the health care whether provided by a doctor of optometry or physician providing like services.
P.L. 1994, ch. 436, § 1. The Explanation by Legislative Council to 94-H 9355 — the bill the General Assembly passed as P.L. 1994, ch. 436, § 1 — states that the basic premise behind the amendment is to "prohibit different rates of payment for doctors of optometry and physicians providing the same types of eye care services when public funds are involved." Explanation By Legislative Council Of An Act, 94-H 9355. Finally, both parties agree that the time frame during which NHPRI paid different rates of reimbursement to optometrists and physicians for similar services is limited to the Time Period. Accordingly, it is the above referenced July 1994 version of § 5-35-21.1 — which was the applicable law during the Time Period — that is of particular relevance to the instant matter. *Page 6 
 III Standard of Review
Summary judgment is appropriate when, after viewing the admissible evidence in the light most favorable to the nonmoving party, "no genuine issue of material fact is evident from `the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' and the motion justice finds that the moving party is entitled to prevail as a matter of law." Smiler v. Napolitano,911 A.2d 1035, 1038 (R.I. 2006) (quoting Rule 56(c)). "Therefore, summary judgment should enter `against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case * * *.'" Lavoie v. Nprth East Knitting, Inc., 918 A.2d 225,228 (R.I. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986) (construing the substantially similar federal rule)). "[C]omplete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."Id. (quoting Celotex, 477 U.S. at 323).
In a summary judgment proceeding, the moving party bears the initial burden of establishing that no genuine issue of material fact exists and can satisfy this burden by "submitting evidentiary materials, such as interrogatory answers, deposition testimony, admissions, or other specific documents, and/or pointing to the absence of such items in the evidence adduced by the parties." Doe v. Gelineau, 732 A.2d 43, 48 (R.I. 1999). If the moving party is able to sustain its burden, then the opposing party must demonstrate the existence of substantial evidence to dispute that of the moving party on a genuine issue of material fact.See Hydro-Manufacturing, Inc. v. Kayser-Roth Corp., 640 A.2d 950, 954
(R.I. 1994); Bourg v. Bristol Boat Co., 705 A.2d 969, 971 (R.I. 1998). Parties opposing summary judgment may not "rely upon mere allegations" but "have an *Page 7 
affirmative duty to set forth specific facts [by affidavit or otherwise] showing that there is a genuine issue of material fact." Bourg,705 A.2d at 971 (emphasis added).
During a summary judgment proceeding "the court may not pass on the weight or credibility of evidence, but must consider affidavits and pleadings in the light most favorable to the party opposing the motion."Lennon v. MacGregor, 423 A.2d 820, 822 (R.I. 1980). The court's purpose during the summary judgment proceeding is issue finding, not issue determination. Indus. Nat'l Bank v. Peloso, 397 A.2d 1312, 1313 (R.I. 1979); Slefkin v. Tarkomian, 238 A.2d 742 (R.I. 1968)). Thus, the only task of a trial justice in ruling on a summary judgment motion is to determine whether there is a genuine issue concerning any material fact which must be resolved. Rhode Island Hosp. Trust Nat'l Bank v.Boiteau, 376 A.2d 323, 324 (R.I. 1977).
Finally, summary judgment is an extreme remedy that should not be used as a substitute for trial or as a device intended to impose a difficult burden on the nonmoving party to save his or her day in court.North Am. Planning Corp. v. Guido, 289 A.2d 423, 425 (R.I. 1972). It is not for the Court to sift out cases that are weak, improbable or unlikely to succeed, and so summary judgment will be denied unless a case is "legally dead" on arrival. Mitchell v. Mitchell, 756 A.2d 179,185 (R.I. 2000).
 IV Applicable Law
Both parties concur that the statute controlling this matter is § 5-35-21.1. Since its enactment in 1988, the statute has been amended several times. For background purposes, an essential history regarding the evolution of the statute from its inception to the current version is appropriate. In 1988, the General Assembly added a "freedom of choice" statute to the Rhode Island General Laws at § 5-35-21.1 to allow health plan *Page 8 
beneficiaries a choice between optometrists and physicians for their eye care. In its original form, § 5-35-21.1 provided that:
 Any contract providing for health care benefits, which calls for the expenditure of private or public funds, for any purpose involving eye care, which is within the scope of the practice of optometry, shall provide the recipients and/or beneficiaries the freedom to choose within the participating provider panel either an optometrist or physician to provide such eye care. This provision shall be applicable whether or not the contract is executed and/or delivered in or outside of the state, or for use within or outside of the state by or for any individuals who reside or are employed in the state.
P.L. 1988, ch. 245, § 2. In July 1994, the statute was amended to include a nondiscrimination provision for the purpose of prohibiting "different rates of payment for doctors of optometry and physicians providing the same types of eye care services when public funds are involved." P.L. 1994, ch. 436, § 1 (Explanation by the Legislative Council). The 1994 amendment was designated as subsection (b) to § 5-35-21.1 and added the following language to the statute:
Provided, however, where the contracts call for the expenditure ofpublic funds, for any purpose involving eye expenditure ofpublic funds, for any purpose involving eye care, there shall be no discrimination as to the rate of reimbursement for such health care whether provided by a doctor of optometry or physician providing like services.
P.L. 1994, ch. 436, § 1 (emphasis added).
A year later, in 1995, the General Assembly again amended § 5-35-21.1. This amendment was added in order to "allow beneficiaries to have the choice of having their eyeglasses or lens prescription filled by either a physician, an optometrist or an optician." P.L. 1995, ch. 253, § 1 (Explanation by the Legislative Council). The amendment — eventually designated as § 5-35-21.1(c) — read as follows: *Page 9 
 Provided further, however, where such contracts call for the expenditure of public funds involving Medicaid and RIte Care for any purpose relating to eyewear, and as it pertains to Opticianry, the distribution, dispensing, filling, duplication and fabrication of eyeglasses or optical prosthesis by opticians as defined in R.I.G.L. 5-35-1, there shall be no discrimination as to the rate of reimbursement for such health care provided by an optician for like services as rendered by other professions pursuant to this section.
P.L. 1995, ch. 253, § 1.
Then, in 1997, the General Assembly amended § 5-35-21.1 for a third time. This third amendment to § 5-35-21.1 was for the purpose of "allow[ing] medicare beneficiaries to have the choice of having their eyeglasses or lens prescription filled by either a physician, an optometrist or an optician." P.L. 1997, ch. 215, § 1 (Explanation by the Legislative Council). The amendment resulted in the following additions to subsection (c):
 Provided further, however, where such contracts call for the expenditure of public funds involving Medicaid and RIte Care, medicare or supplemental coverage for any purpose relating to eyewear, and as it pertains to Opticianry, the distribution, dispensing, filling, duplication and fabrication of eyeglasses or optical prosthesis by opticians as defined in section 5-35-1, there shall be no discrimination as to the rate of reimbursement for such health care provided by an optician for like services as rendered by other professions pursuant to this section.
P.L. 1997, ch. 215, § 1 (emphasis added). Later that same year, the General Assembly decided to further amend sub-section (c) to "allow providers, including opticians, of the opportunity to apply for participation in contracts involving the expenditure of public funds." P.L. 1997, ch. 216, § 1 (Explanation by the Legislative Council). Following this second 1997 amendment to § 5-35-21.1, sub-section (c) read as follows: *Page 10 
 Provided further, however, where such contracts call for the expenditure of public funds involving Medicaid and RIte Care, medicare or supplemental coverage for any purpose relating to eyewear, and as it pertains to Opticianry, the distribution, dispensing, filling, duplication and fabrication of eyeglasses or optical prosthesis by opticians as defined in section 5-35-1, all such health plans or contracts shall be required to notify by publication in a public newspaper published within and circulated and distributed throughout the state of Rhode Island, to all providers, including but not limited to opticians, within the health plan's or contract's geographic service area of the opportunity to apply for credentials, and further, there shall be no discrimination as to the rate of reimbursement for such health care provided by an optician for like services as rendered by other professions pursuant to this section. Nothing contained herein shall require health plans to contract with any particular class of providers.
P.L. 1997, ch. 216, § 1 (emphasis added).
Finally, in 2005, the General Assembly amended both subsections (b) and (c) one more time. The basic premise behind the amendment — which became effective July 15, 2005 — was expansion of the law concerning freedom of choice for eye care to contracts providing for the expenditure of private funds. P.L. 2005, ch. 303, § 1 (Explanation by the Legislative Council). Following the 2005 amendment, the current version of § 5-35-21.1 provides that:
 (a) Any contract providing for health care benefits, which calls for the expenditure of private or public funds, for any purpose involving eye care, which is within the scope of the practice of optometry, shall provide the recipients and/or beneficiaries the freedom to choose within the participating provider panel either an optometrist or physician to provide the eye care. This provision shall be applicable whether or not the contract is executed and/or delivered in or outside of the state, or for use within or outside of the state by or for any individuals who reside or are employed in the state. *Page 11 
 (b) Where the contracts call for the expenditure of public or private funds, for any purpose involving eye expenditure of public or private funds, for any purpose involving eye care, there shall be no discrimination as to the rate of reimbursement for the health care, whether provided by a doctor of optometry or physician providing similar services.[5]
 (c) Where the contracts call for the expenditure of public funds or private funds involving Medicaid and RIte Care, Medicare, or supplemental coverage for any purpose relating to eyewear, and as it pertains to opticianry, the distribution, dispensing, filling, duplication and fabrication of eyeglasses or optical prosthesis by opticians as defined in R.I.G.L. 5-35-1, those health plans or contracts are required to notify by publication in a public newspaper published within and circulated and distributed throughout the state of Rhode Island, to all providers, including, but not limited to, opticians, within the health plan's or contract's geographic service area, of the opportunity to apply for credentials, and there is no discrimination as to the rate of reimbursement for health care provided by an optician for similar services as rendered by other professions pursuant to this section. Nothing contained in this chapter shall require health plans to contract with any particular class of providers.
2005 R.I. Pub. Laws, ch. 303, § 1 (emphasis added).
 V Analysis
This dispute rests on the determination of whether the funds used by NHPRI to pay its medical service providers during the Time Period are considered public or private funds. Rhode Island case law, as well as statutory law, is void of any specific definition of what constitutes "public funds" under the laws of this state. Consequently, in order to determine whether the funds NHPRI paid to its medical service providers during the *Page 12 
Time Period should be characterized as public or private funds, the Court must closely examine the relationship among DHS, NHPRI, and the medical service providers and (b) how the monthly capitation funds transferred from DHS are managed and controlled once in NHPRI's possession.
First, when DHS wires its monthly fixed capitation payments to NHPRI — a private entity — the funds are transferred into NHPRI's "operating" bank account, which is managed exclusively by NHPRI and maintained solely in NHPRI's name. (Coburn Aff ¶ 16,1121.) NHPRI is free to transfer funds between its accounts, which it does, and since oftentimes NHPRI does not immediately need the capitation funds, NHPRI transfers a large majority of the DHS payments from NHPRI's operating account into higher yield investment accounts. Id. ¶ 18, 1f20. NHPRI engages in these activities with absolutely no oversight, participation, or consultation from DHS. Id. 1fl9. Further, the capitation funds transferred from DHS to NHPRI are recognized by NHPRI as revenue in its financial statements, audits, and nonprofit tax returns filed with the United States Internal Revenue Service. Id. ¶ 22. In short, it appears as though once DHS transfers the capitation funds to NHPRI, DHS relinquishes virtually all control over the funds and has no contractual right to further direct how NHPRI manages its resources. Id. ¶ 23-25.
As touched upon previously, each month DHS transfers a fixed capitation payment to NHPRI to cover every Rite Care enrollee's health care costs for that month — regardless of whether each enrollee actually uses health care services for a particular month. Id. 1f 14; seealso DHS Contract § 1.01. For instance, if NHPRI has 100 Rite Care enrollees and the pre-determined capitation payment is $100 per Rite Care enrollee per month, then each month DHS would presumably transfer a $10,000 capitation *Page 13 
payment to NHPRI. Once NHPRI receives those funds, however, NHPRI is not contractually mandated to turn around and use all of that $10,000 capitation payment to pay for the health care costs of its enrollees.See Coburn Aff. ¶ 14-25; see also DHS Contract. If it only costs NHPRI $8,000 in a particular month to pay all the health care costs of its Rite Care enrollees, there is nothing in the contract between DHS and NHPRI that requires the leftover $2,000 of capitation funds to be transferred back to the State or used for a particular purpose.See DHS Contract. That money is conceivably available for NHPRI to use for whatever corporate purpose it may deem appropriate, and NHPRI need not seek consent from DHS when utilizing those funds. See Coburn Aff. ¶ 14-25.
Another key detail the Court finds significant is the fact that the medical service providers are not privy to the contract between DHS and NHPRI and are not paid by DHS directly at any time for services rendered. See id. ¶ 31-34; see also Supp. Coburn Aff. 1} 4; DHS Contract. It is NHPRI, not DHS, who determines which medical service providers to contract with and what the applicable rates of reimbursement will be. See Coburn Aff. ¶ 28-34; see also Supp. Coburn Aff. ¶ 2-3. DHS neither instructs nor influences NHPRI in any way as to which medical service providers NHPRI should contract with or as to how much NHPRI should pay the medical service providers for services rendered. See Coburn Aff. ¶ 28-34; see also Supp. Coburn Aff. ¶ 2-3. NHPRI makes these decisions independently, as a private entity, with no State influence. See Coburn Aff. ¶ 28-34; see also Supp. Coburn Aff. ¶ 2-4. Further, DHS has insulated itself from any and all liability for claims brought against NHPRI by its medical service providers.See DHS Contract § 3.04.03, § 3.05.05. Specifically, the contract between NHPRI and DHS provides that the "State shall bear no liability (other than liability for *Page 14 
making payments required by this agreement) for paying any valid claims of Health Plan subcontractors, including providers and suppliers. . . ." (DHS Contract § 3.04.03); see also Coburn Aff. ¶ 27. In summation, much like the decisions concerning how to manage and utilize its funds, it appears as though all of the decisions NHPRI makes with regard to its medical service providers — from which medical service providers to contract with to what the applicable rates of reimbursement will be — are made completely autonomously. See Coburn Aff. ¶ 26-34; seealso Supp. Coburn Aff. ¶ 2-4; DHS Contract.
NHPRI also asserts, and the Optometrists have failed to present case law to the contrary, that public funds are those controlled by governmental bodies. NHPRI's basic premise is that once the government transfers funds to a private entity in exchange for a service, the funds are no longer considered public funds. Elaborating further on this line of reasoning, NHPRI analogizes the relationship between DHS and NHPRI to a typical employer/employee or principal/contractor relationship, where the government hires a private entity or person to perform a service for compensation. To illustrate, consider the situation of an employee of the State who is paid his or her salary. Once the government transfers "public" funds over to an employee, those funds then become the employee's own private funds. See Allison Engine Co., Inc. v. UnitedStates, No. 07-214, 2008 WL 2329722 *5 (U.S., June 9, 2008) (rejecting claim under False Claims Act where private party payed false claim with funds obtained from federal government). In Allison Engine, the United States Government argued that it is customary to say that the Government pays a bill when a person [or entity] receives Government funds and subsequently uses those funds to pay a bill or expense. Id. The United States Supreme *Page 15 
Court, however, found the Government's assertion unpersuasive, stating that the Government's argument involved a "colloquial usage of the phrase `paid by' that is not customarily employed in more formal contexts." Id. The Supreme Court further expounded upon its reasoning by providing that, "if a federal employee who receives all of his income from the government were asked in a formal inquiry to reveal who paid for . . . his new car or a vacation, the employee would not state that the federal government had footed the bill." Id.
The essential principle articulated by the United States Supreme Court in Allison Engine — that the definition of "government" or "public" funds has limitations once the funds are transferred from the government to an employee [or private entity] — is directly applicable to the case at bar. Here, DHS is supplying NHPRI with monthly capitation payments — "public" funds — in return for NHPRI's provision of health care services for its Rite Care enrollees. Like an employee's paycheck, these capitation payments are in essence compensation for NHPRI's efforts to provide health care services for its Rite Care enrollees, and upon transfer from DHS, those funds become NHPRI's own private funds. Thus, despite the fact that the capitation funds originate with the State, when NHPRI subsequently pays its medical service providers for services rendered, it is doing so with its own private funds. See id.
Next, regarding the issue of "state action," the Optometrists put forth the argument that as a Medicaid Managed Care Organization (MCO) participating in the administration of Rhode Island's Medicaid program, NHPRI is likely considered a "state actor" for certain Medicaid-related purposes. (Plaintiffs' Memorandum in Support of their Motion for Summary Judgment 25). In most situations where a private organization *Page 16 
is considered a "state actor," there is a significant level of government "entwinement" with the policy, management, and control of the entity. Evan v. Newton, 382 U.S. 296, 299 (1996) ("Conduct that is formally `private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."); see also Jacksonv. Metropolitan Edison Co., 419 U.S. 345, 351 (1974) (the determination of whether the action of a regulated entity is "state" action depends on "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself[]");American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40 (1999) (a private insurers' decisions to withhold payment for disputed medical treatment pending "utilization review" of reasonableness and necessity of particular medical treatments was not fairly attributable to the State);Blum v. Yaretsky, 457 U.S. 991 (1982) (a private nursing home's decisions to discharge or transfer Medicaid patients to lower levels of care did not rise to level of state action); Rendell-Baker v. Kohn,457 U.S. 830 (1982) (a private school did not act under color of state law when it discharged certain employees because, although funded and extensively regulated by public authorities, the school's decisions were not compelled or influenced by the state). Specifically, inBlum, the United States Supreme Court laid out a test that outlines three specific areas to consider when evaluating whether a private party has committed a state action. Blum, 457 U.S. 1004-05.
The first prong of the test set out in Blum requires the showing of a "sufficiently close nexus" between the State and the challenged action or regulated entity. Id. at 1004 (quoting Jackson, 419 U.S. at 351). The second prong of the Blum test requires a *Page 17 
showing that the State has exercised such coercive power or provided such significant encouragement that the decision by the private entity must "in law be deemed to be that of the State." Id. Mere approval of or acquiescence in the private party's actions is not sufficient to meet this second prong. Id. at 1004-05. Lastly, the third part of the test provides that the "required nexus may be present if the private entity has exercised powers that are `traditionally the exclusive prerogative of the State.'" Id. at 1005 (quoting Jackson, 419 U.S. at 353).
Applying these precepts to the instant matter, the Court finds that state action was not present in NHPRI's decision to reimburse optometrists at a lower rate than physicians for similar services during the Time Period. Regarding prongs one and two of the Blum test, NHPRI has sole discretion in determining which medical service providers to contract with and what the applicable rates of reimbursement will be.See Coburn Aff ¶ 28-34; see also Supp. Coburn Aff. ¶ 2-3. As such, there is no "close nexus" between the State and NHPRI with respect to deciding which medical service providers to contract with and how much to pay them for their services — NHPRI makes these decisions entirely on its own, without any input, coercion, or participation from the State.See Coburn Aff. ¶ 28-34; see also Supp. Coburn Aff. ¶ 2-3. In short, the challenged decision(s) in the present matter was made exclusively by a private entity, based on independent professional judgment, and was not dictated or influenced by any tenet or course of conduct established by the State. See Coburn Aff. ¶ 28-34; see also Supp. Coburn Aff. ¶ 2-4. Consequently, with respect to NHPRI's decision to discriminate in its rates of reimbursement paid to optometrists and physicians for similar services rendered during the Time Period, prongs one (1) and two (2) of the Blum test for determining *Page 18 
whether a private party has committed state action cannot be satisfied.[6][7] See Rendell-Baker, 457 U.S. at 841-42 ("[T]he decisions to discharge the petitioners were not compelled or even influenced by any state regulation . . . [such minimal] regulation is not sufficient to make a decision to discharge, made by private management, state action.")
Finally, the 2005 amendments to § 5-35-21.1(b) and (c) provide the Court with further guidance on whether NHRPI was bound by the statute during the Time Period. Prior to the 2005 amendment, § 5-35-21.1(c) governed "the expenditure of public funds involving Medicaid and RIte Care, Medicare or supplemental coverage" for eyewear. Section § 5-35-21.1(c) (2004). In 2005, however, the General Assembly simultaneously expanded the scope of § 5-35-21.1(b) and (c) to cover expenditures of private funds. 2005 R.I. Pub. Laws, ch. 303, § 1. In particular, the 2005 amendment to § 5-35-21.1(c) expanded the subsection to cover "expenditure[s] of public or private funds involvingMedicaid and RIte Care . . . for any purpose relating to eyewear. . . ." Li (emphasis added). The Court hastens to add that, on its face, this amendment seems to be an acknowledgement by the General Assembly that there are indeed circumstances in which *Page 19 
private funds are utilized in the payment of health care services under the Medicaid and RIte Care system.
In Rhode Island, the State does not directly contract with or pay medical service providers for the provision of health care services for eligible Rite Care enrollees. See Medical Assistance Program — Section 0348 — Rite Care Program, § 0348.05 (Rev. 10/2005); see also Coburn Aff. ¶ 32,¶ 34; Supp. Coburn Aff. ¶ 2-4. To the contrary, Rite Care is administered through a managed care program in which the State contracts with private HMOs — such as NHPRI — to provide the health care coverage for Rite Care eligible enrollees. See Medical Assistance Program — Section 0348 — Rite Care Program, § 0348.05 (Rev. 10/2005); seealso Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Exhibit 1. In return for their services, the State pays the HMOs a fixed monthly premium per enrollee. See Medical Assistance Program — Section 0348 — Rite Care Program, § 0348.05 (Rev. 10/2005);see also Coburn Aff. ¶ 14; DHS Contract § 1.01, § 2.15, § 3.04.01. In a situation where the State contracts with and pays medical service providers directly, there is little question that the funds the State uses to pay the medical service providers would be considered public funds. However, if the funds expended by a private HMO under a managed care Medicaid program are also considered public funds, then it becomes entirely unclear as to (a) what, if anything, is considered an expenditure of private funds involving Medicaid and RIte Care and (b) what purpose the General Assembly had in amending § 5-35-21.1(c) to include the phrase "or private."
Against this backdrop, it is important to note that when the General Assembly decides to amend a statute, it is presumed that the legislature has an intended purpose for taking such action. Hometown Properties,Inc. v. Fleming, 680 A.2d 56, 62 (R.I. 1996) *Page 20 
("[I]t is generally true that, when a statutory provision is amended, the General Assembly is assumed to have intended to accomplish some purpose thereby. . . ."); see also Gross v. State Division ofTaxation, 659 A.2d 670, 671 (R.I. 1995) ("Every word, sentence or provision in a statute is presumed to have some useful purpose and is intended to have some force and effect.") In brief, the General Assembly must have had a legitimate reason for amending § 5-35-21.1(c) — and § 5-35-21.1(b) — to include the phrase "or private." If not, such inconsequential additions by the legislature would be in direct contrast with established judicial principles of statutory construction, "a statute . . . may not be construed . . . to render sentences, clauses, or words surplusage." Brennan v. Kirby, 529 A.2d 633, 637 (R.I. 1987);State v. Gonsalves, 476 A.2d 108, 110-11 (R.I. 1984) ("[W]e should give effect to all parts of [a] statute, if reasonably possible. . . .") (emphasis added) (quoting Rhode Island Chamber of Commerce v.Hackett, 411 A.2d 300, 303 (R.I. 1980)); see also U.S. ex rel. Totten v.Bombardier Corp., 380 F.3d 488, 499 ("It is . . . a cardinal principle of statutory construction that a statute ought . . . to be so construed that . . . no clause, sentence, or word shall be superfluous, void, or insignificant.") (quoting Alaska Dep't of Envtl. Conservation v.EPA, 540 U.S. 461 n. 13 (2004)).
Here, the most plausible inference that can be made regarding the significance of the 2005 amendment to § 5-35-21.1(c) is that by enacting the amendment, the General Assembly intended to expand the regulatory scope of subsection (c) to expenditures of private funds involving Medicaid and RIte Care — such as NHPRI's payments to its medical service providers — which had not previously been governed by the statute. Similarly, the same logic can be applied in determining the impact of the simultaneous *Page 21 
2005 amendment to § 5-35-21.1(b). Prior to 2005, § 5-35-21.1(b) covered expenditures of only public funds. P.L. 1994, ch. 436, § 1. As a result, parties were forbidden from discriminating with regard to rates of reimbursement only when public funds were used. See id. In order to expand the scope of § 5-35-21.1(b) to situations where private funds are involved — such as NHPRI's payments to its medical service providers — the General Assembly presumably amended subsection (b) in 2005 to include the term "private."
 VI Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court finds that NHPRI did not violate § 5-35-21.1(b) — as it existed prior to the July 2005 amendment — when it paid to optometrists a lower rate of reimbursement than it did to physicians for similar services during the Time Period because NHPRI did so using private, not public, funds. Furthermore, given that both parties agree this is the determinative issue and there remains no fact in question or in dispute, the Court hereby grants NHPRI's Motion for Summary Judgment and denies the Optometrists' Motion for Summary Judgment.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] Pursuant to the July 2005 amendment to § 5-35-21.1(b), the equal rate of reimbursement requirement now applies to expenditures of both public and private funds. 2005 R.I. Pub. Laws, ch. 303, § 1.
[2] On February 18, 2008, this Court certified the class pursuant to Super. R. Civ. P. 23(a) and (b)(3).
[3] During the Time Period, DHS and NHPRI were parties to two separate contracts. The first contract was in affect from July 1, 1998 through December 31, 2004. The second contract became operative on January 1, 2005 and is still currently in affect. It should be noted that the content and terms of both contracts is substantially similar.
[4] Since the July 15, 2005 amendment to § 5-35-21.1(b), NHPRI has paid optometrists and ophthalmologists equal reimbursement rates for the provision of similar services. Id.. ¶ 39, ¶ 40.
[5] The Court is mindful of the fact that the version of § 5-3 5-21.1(b) that is central to the instant matter is the version that was in effect during the Time Period. That version is virtually identical to the current adaptation, but without the underscored words "or private."
[6] The United States Supreme Court in Blum further noted that substantial State regulation and funding mechanisms for private entities are not enough to transform that party's decisions into state action without more extensive State control and influence. Blum,457 U.S. at 1011; see also American Mfrs. Mut. Ins. Co., 526 U.S. at 52, 57-58;Rendell-Baker, 457 U.S. at 840. In the instant matter, aside from the receipt of State funding in the form of monthly capitation payments, NHPRI appears to be free from any form of State influence or management in its affairs. NHPRI is controlled by its corporate members, and the State has no interest — minor or controlling — in NHPRI. See Coburn Aff. U 6, U 7. Further, no members of NHPRI's board or administration are appointed by or affiliated with the State. This structure of governance and ownership further suggests that NHPRI is a purely private organization, completely autonomous from the State. As a result, the mere fact that NHPRI receives public funds from the State is not enough, on its own, to transform NHPRI's decisions into state action. SeeBlum, 457 U.S. at 1011; see also American Mfrs. Mut. Ins. Co.,526 U.S. at 52, 57-58; Rendell-Baker, 457 U.S. at 840.
[7] With respect to prong three of the Blum test, the Optometrists have neither argued nor presented the Court with any evidence from which to conclude that in determining reimbursement rates for its medical service providers, NHPRI performs a function that has been "traditionally the exclusive prerogative of the State." Blum,457 U.S. at 1011 (quoting Jackson, 419 U.S. at 353). As a result, the Court further finds that prong three of the Blum test has also not been satisfied. *Page 1